1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12   RODNEY EUGENE WALKER BEY,     )        No. CV 05-2324-ODW(CW)
                                   )
13   a.k.a. RODNEY BEY,            )
                                   )
14                 Petitioner,     )        REPORT AND RECOMMENDATION OF
                                   )        UNITED STATES MAGISTRATE JUDGE
15       v.                        )
                                   )
16   SCOTT KERNAN,                 )
                                   )
17                 Respondent.     )
     ──────────────────────────────)
18

19       This Report and Recommendation is submitted to the Honorable Otis

20   D. Wright, II, United States District Judge, pursuant to 28 U.S.C.

21   § 636 and General Order 194 of the United States District Court for

22   the Central District of California.  For reasons stated below, the

23   petition for habeas corpus relief should be denied and this action

24   dismissed with prejudice.

25              **I.  PROCEDURAL HISTORY**

26       The pro se petitioner, a prisoner in state custody, challenges a

27   conviction in California Superior Court, Los Angeles County, Case No.

28   YA049040.  [Reporter's Transcript ("RT") at 1.]  On May 8, 2002,

                              -1-

following a trial in which Petitioner represented himself, a jury convicted Petitioner of possession of a firearm by an ex-felon (Cal. Penal Code § 12021(a)(1)) and carrying a loaded firearm (Cal. Penal Code § 12031(a)(1)). [RT at 3601-03; Clerk's Transcript ("CT") at 558-59.] The jury also found true allegations that Petitioner had suffered prior felony convictions, had not remained prison-free for more than five years after release from prison, and had committed new offenses resulting in felony convictions within that five-year period (Cal. Penal Code §§ 667, 667.5(b), 1170.12). [RT at 3602-03; CT at 560.] Under California's Three Strikes Law, Petitioner was sentenced to twenty-six years to life in state prison. [CT at 661-63.]

Petitioner appealed. [Respondent's Lodged Docs. A2-A4.] On September 10, 2003, the California Court of Appeal affirmed the judgment in an unpublished opinion. ["Opinion," No. B161169, Lodged Doc. A5.] Petitioner then filed two petitions for review in the California Supreme Court, one by counsel and one pro se. [Lodged Docs. B1-B3.] On January 14, 2004, the supreme court summarily denied review of both petitions. [Lodged Doc. B4.]

While his direct appeal was pending, Petitioner filed a petition for writ of habeas corpus in the Los Angeles Superior Court. [Lodged Doc. F1.] That petition was denied on August 21, 2003. [Lodged Doc. F2.] While that petition was pending, Petitioner filed another petition for writ of habeas corpus in the court of appeal, which denied the petition on September 18, 2003. [Lodged Docs. C1-C2.] Thereafter, while his petitions for review were pending before the California Supreme Court, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which denied the petition on July 28, 2004. [Lodged Docs. E1-E6.] While that petition

-2-

1  was pending, Petitioner filed two more state habeas petitions, one in
2  the superior court and another in the court of appeal.  [Lodged Docs.
3  D2, F3.]  Both petitions were denied.  [Lodged Docs. D3, F4.]

4      On March 28, 2005, Petitioner filed his initial petition for writ
5  of habeas corpus in this court.  [Docket no. 1.]  On April 22, 2005,
6  he filed a first amended petition.  [Docket no. 7.]  After Respondent
7  moved to dismiss the first amended petition as unexhausted, this court
8  granted Petitioner's request to stay the first amended petition
9  pending exhaustion of Petitioner's state court remedies on his
10  unexhausted claims.  Petitioner then filed another habeas petition in
11  the California Supreme Court.  [Lodged Docs. G1-G2.]  On May 10,
12  2006, the California Supreme Court denied the petition.  [Lodged Doc.
13  G3.]

14      On June 23, 2006, Petitioner filed a second amended petition in
15  this court.  [Docket no. 38.]  On August 28, 2007, Respondent filed an
16  answer to the second amended petition.  [Docket no. 46.]  On January
17  3, 2008, Petitioner filed a traverse.  [Docket no. 59.]  The matter
18  has been taken under submission without oral argument.

19                    **II.  <u>FACTUAL BACKGROUND</u>**

20      On direct appeal, the court of appeal gave the following summary:

21          On August 13, 2001, two deputies of the Los Angeles
22      County Sheriff were on routine patrol in the area of 92nd
23      Street and Normandie Avenue in Los Angeles County when they
24      observed [Petitioner] who was walking southbound on
25      Normandie on the sidewalk on the west side of the street.
26      When [Petitioner] observed the officers he sped up and at
27      the intersection of 92nd and Normandie, crossed the street
28      against the light, and proceeded to the northwest corner of

                                -3-

1    the intersection.

2        The deputies exited their car, and as they approached

3    [Petitioner] they asked [Petitioner] to come over to them.

4    When [Petitioner] was asked if he had any weapons on him,

5    [Petitioner] responded he had a gun.

6        [Petitioner], who was wearing a bulky black down jacket

7    (even though it was August), moved his hands from his body

8    and the deputies observed a bulge in [Petitioner]'s

9    waistband.  One of the deputies searched [Petitioner] and

10   found a loaded firearm.  [Petitioner] was then placed under

11   arrest.

12   [Opinion at 2-3.]

13                    III.   **PETITIONER'S CLAIMS**

14       Petitioner now asserts the following (twenty-seven out of a

15   previous thirty-four) claims:[1]

16   1.   Petitioner was denied due process of law when the trial court

17        denied his pre-trial discovery motion.

18   2.   The trial court denied Petitioner due process by restricting his

19        right to cross-examine the witnesses against him.

20   3.   Petitioner was denied the right to a jury representing a fair

21        cross-section of the community.

22   4.   Petitioner's right to a fair and impartial jury was denied

23        because of juror misconduct.

24   5.   The trial court denied Petitioner due process by denying his

25        request for discovery on whether his prior convictions qualified

26   ────────────────────

27       [1]  Petitioner stated thirty-four claims in his second amended
     petition ("SAP").  [SAP at 5-17.]  In his traverse, he abandoned
28   Claims Ten, Thirteen, Sixteen, Seventeen, Twenty-four, Twenty-seven,
     and Thirty-one.  [Traverse at ii.]

                              -4-

as "strikes" under California's Three Strikes Law.

6.    The trial court denied Petitioner due process by imposing a sentence that violated California's statutory prohibition against dual use of facts.

7.    The arresting deputies violated Petitioner's right to due process by knowingly destroying exculpatory evidence.

8.    The prosecutor violated Petitioner's rights by exercising illegal peremptory challenges against African-American jurors.

9.    The trial court denied Petitioner due process by imposing a sentence based on facts neither found by the jury, nor admitted by Petitioner.

11.   The prosecutor denied Petitioner a fair trial by signaling to a witness during Petitioner's cross-examination of the witness.

12.   The trial court denied Petitioner due process by prohibiting him from introducing relevant impeachment evidence.

14.   The prosecutor denied Petitioner a fair trial by vouching for the credibility of the prosecution's witnesses.

15.   The prosecutor denied Petitioner a fair trial by inflaming the jury's passions and prejudices.

18.   The trial court denied Petitioner due process by allowing the prosecutor to introduce incriminating statements Petitioner allegedly made to the arresting deputies.

19.   The trial court denied Petitioner a fair trial by displaying hostility toward him, while showing favoritism toward the prosecutor.

20.   The trial court denied Petitioner a fair trial by improperly communicating with the jury.

21.   Petitioner was denied his right to a vicinage jury.

22.  The trial court denied Petitioner due process by misapplying
     clearly established Federal law in resolving his motion to
     suppress evidence.

23.  The trial court denied Petitioner due process by denying his
     request for discovery of personnel records of arresting deputies.

25.  The trial court denied Petitioner due process by refusing to hear
     his arguments on the validity and length of his sentence.

26.  The trial court denied Petitioner due process by refusing to
     appoint a fingerprint expert.

28.  The trial court denied Petitioner due process  by instructing the
     jury to resolve a disputed fact in the prosecution's favor.

29.  The trial court denied Petitioner a fair trial by refusing to
     instruct the jury on Petitioner's defense.

30.  The trial court denied Petitioner due process by denying his
     request for transcripts to assist in filing a new trial motion.

32.  Petitioner was denied a fair trial by the cumulative effect of
     the prosecutor's acts of misconduct.

33.  Petitioner was denied a fair trial by the cumulative effect of a
     combined pattern of judicial and prosecutorial misconduct.

34.  Petitioner was denied effective assistance of appellate counsel
     because appellate counsel failed to raise the majority of the
     claims set forth above.

### IV.   STANDARD OF REVIEW

A federal court may review a habeas petition by a person in
custody under a state court judgment "only on the ground that he is in
custody in violation of the Constitution or laws or treaties of the
United States."  28 U.S.C. § 2254(a).  Federal habeas relief is not
available for state law errors.  Swarthout v. Cook, ___ U.S. ___, 131

S. Ct. 859, 861, ___ L. Ed. 2d ___ (2011)(per curiam)(citing Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 784-85, ___ L. Ed. 2d ___ (2011).

Here, "clearly established federal law" means federal law clearly established in the holdings of the Supreme Court at the time of the state court decision. Cullen v. Pinholster, No. 09-1088, 2011 WL 1225705, at *9 (U.S., Apr. 4, 2011); Harrington, 131 S. Ct. at 785; Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). Although only Supreme Court law is binding, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

"To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." Cullen, 2011 WL 1225705, at *9 (citing Williams, 529 U.S. at 405-06). "If the state-court decision 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" Cullen, 2011 WL 1225705, at *9 (citing Williams, 529 U.S. at 413). "'[A]n unreasonable application of federal law is different from an incorrect application of federal law." Harrington, 131 S. Ct. at 785 (quoting Williams, 529 U.S. at 410). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 131 S. Ct. at 785 (citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004)).

A federal habeas court must defer, under § 2254(d), to a state court decision on the merits, "even where there has been a summary denial." Cullen, 2011 WL 1225705, at *11; (citing Harrington, 131 S. Ct. at 786). In the face of a summary denial by a state court, a petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis'" for the state court's decision. Cullen, id. (citing Harrington, 131 S. Ct. at 784). A federal "habeas court must determine what arguments or theories supported, or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Harrington</u>, 131 S. Ct. at 786.

The AEDPA statute preserves the authority of federal courts "to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents.  It goes no farther." <u>Id.</u>  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87.

## V. <u>DISCUSSION</u>

### A.   CLAIM ONE – DISCOVERY OF SHERIFFS DEPARTMENT'S PRACTICES

In his first claim for relief, Petitioner contends that the trial court erred in refusing to allow him discovery regarding the Lennox Sheriff's Department's discriminatory practices.  Specifically, Petitioner asserts that the requested discovery was necessary to allow him to prove that the department impermissibly targets twenty-five gangs, including one of which he is a member.  Petitioner maintains that, had he been allowed the requested discovery, he could have shown that his arrest and conviction resulted from the unconstitutional selective prosecution of the twenty-five gangs.  Petitioner raised this claim in a habeas petition which the California Supreme Court denied without comment.  [Lodged Docs. E2, E6.]

Courts generally presume that prosecutors faithfully and lawfully discharge their constitutional duties and, in the ordinary case, prosecutors have significant discretion to determine whether or not to prosecute.  <u>United States v. Armstrong</u>, 517 U.S. 456, 464, 116 S. Ct.

1480, 134 L. Ed. 2d 687 (1996).  A prosecutor's discretion in

determining whether to prosecute is, of course, "subject to

constitutional constraints."  Id. (citation omitted).  Nevertheless,

"'[t]he conscious exercise of some selectivity in enforcement is not

in itself a federal constitutional violation' so long as 'the

selection was not deliberately based upon an unjustifiable standard

such as race, religion, or other arbitrary classification.'"  Nunes v.

Ramirez-Palmer, 485 F.3d 432, 441 (9th Cir. 2007)(quoting

Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d

604 (1978)).

        To establish selective prosecution based on an arbitrary

classification, the claimant must demonstrate that the prosecutorial

policy "had a discriminatory effect and that it was motivated by a

discriminatory purpose."  Armstrong, 517 U.S. at 465 (citation

omitted).  In determining whether the claimant has made the requisite

showing, courts must be mindful that the claimant's "'standard [of

proof] is a demanding one.'"  Nunes, 485 F.3d at 441 (quoting

Armstrong, 517 U.S. at 463).

        By contrast, in order to obtain discovery on the issue of

selective prosecution, the claimant must provide "some evidence

tending to show the existence of the essential elements" of the claim,

namely discriminatory effect and discriminatory intent.  Armstrong,

517 U.S. at 468-69.  Although this standard is less demanding than

that necessary to show an actual discriminatory intent, the Ninth

Circuit has stated that it remains "a 'rigorous' one designed to

minimize interference with the prosecutorial function."  United States

v. Arenas-Ortiz, 339 F.3d 1066, 1068 (9th Cir. 2003)(citing Armstrong,

517 U.S. at 468).

Here, assuming that Petitioner had a constitutional right to discovery,[2] he nevertheless provided no evidence to show the existence of the essential elements of his discrimination claim.  Rather, his claim is premised entirely on a detective's preliminary hearing testimony that police in the Lennox station's gang unit "target" twenty-five gangs in the area in which Petitioner was arrested.  [CT at 22.]  From that, Petitioner extrapolates that police are actively engaging in discrimination by selectively prosecuting certain gang members, but not others.  But other than Petitioner's belief, there is no evidence whatsoever to suggest that the police department's decision to target twenty-five gangs, as opposed to the seventy-five gangs that Petitioner maintains are active in the area, stems from an intent to discriminate.  Indeed, this decision more likely reflects a need to effectively use limited resources and evidences a belief that the twenty-five targeted gangs pose a greater danger to the community than do the other fifty gangs.

Likewise, even if Petitioner could somehow show a discriminatory intent, he has not shown any evidence of a discriminatory effect.  Indeed, no evidence suggests that similarly situated persons – presumably, members of the other fifty gangs in the area — are not prosecuted for possessing loaded firearms in public.  See United States v. Bass, 536 U.S. 862, 864, 122 S. Ct. 2389, 153 L. Ed. 2d 769 (2002)(per curiam)("Under Armstrong, therefore, because respondent

---

[2]  Although a prosecutor must disclose to a criminal defendant any exculpatory material, the Supreme Court has repeatedly held that there is no general constitutional right to discovery in criminal cases.  See United States v. Ruiz, 536 U.S. 622, 629 122 S. Ct. 2450, 153 L. Ed. 2d 586 (2002); Pennsylvania v. Ritchie, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987);  Weatherford v. Bursey, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L. Ed. 2d 30 (1977).

failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery.").

Accordingly, the California Supreme Court's denial of Petitioner's challenge to the trial court's decision denying discovery on the selective prosecution of gang members was neither contrary to, nor an unreasonable application of, clearly established Federal law, and federal habeas relief is not available on this claim.

### B.   CLAIMS TWO AND TWELVE – EVIDENTIARY DECISIONS

Petitioner asserts two separate challenges to the trial court's evidentiary decisions.  First, in Claim Two, he contends that the trial court unfairly restricted his ability to cross-examine Daniel Martin and Antonio Sanchez, the two deputy sheriffs who arrested him. Specifically, Petitioner faults the trial court for prohibiting him from impeaching the deputies with their prior testimony, refusing to allow him to question them about whether they followed proper procedure in arresting him, and abruptly ending his cross-examination of Deputy Sheriff Sanchez.  Petitioner asserts that, had he been permitted to fully cross-examine these two witnesses, he could have elicited testimony showing that neither witness was credible.

Second, in Claim Twelve, Petitioner contends that the trial court improperly prevented him from presenting additional evidence that would have impeached the credibility of the arresting deputies. Specifically, Petitioner sought to introduce evidence regarding the Lennox Sheriff's Department's mobile data terminal ("MDT").[3] According to Petitioner, this evidence would have shown that the deputies notified their dispatcher that Petitioner was a "suspicious

---

[3]  An MDT is a computerized device in a patrol car that allows officers to communicate with a dispatcher.  [See RT at 2180, 2284-86.]

person" when they stopped him – that is, before he indicated he had a gun.  Here, Petitioner maintains that the excluded evidence would have shown that the arresting deputies perjured themselves when they testified that they stopped him for crossing against a red "don't walk" light.  This point was significant because it would have undermined the deputies' credibility; consequently, the evidence would have bolstered Petitioner's defense that the deputies planted a gun on him and later lied about finding the gun.

Petitioner raised both of these claims a habeas petition, which the California Supreme Court denied without comment.  [Lodged Docs. E2, E6.]

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690,  106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)(quoting California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984))(citations omitted); Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); see also Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting Trombetta, 467 U.S. at 485 (1984)); DePetris v. Kuykendall, 239 F.3d 1057, 1062-63 (9th Cir. 2001)(exclusion of evidence that was critical to a defendant's ability to defend and "went to the heart of the defense" violated the clearly established right to present a valid defense)(citing Chambers, 410 U.S. at 294; Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)); LaJoie v. Thompson, 217 F.3d 663, 668 (9th Cir. 2000).

However, to evaluate a claim of inability to present a complete

-13-

defense based on the exclusion of evidence, reviewing courts must be mindful that state evidentiary rulings are not cognizable in a federal habeas proceeding unless constitutional rights are affected.  See Estelle v. McGuire, 502 U.S. at 68; Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990).  When a state court excludes certain evidence, habeas relief is not warranted unless the exclusion is so prejudicial as to jeopardize the defendant's due process rights.  Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990).  In other words, in order to prevail, a petitioner must show that the court's ruling was so prejudicial that it rendered his trial fundamentally unfair.  See Estelle, 502 U.S. at 68; Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991); see also McKinney v. Rees, 993 F.2d 1378, 1380 (9th Cir. 1993).

Moreover, the right to present relevant evidence "'may, in appropriate circumstances, bow to accommodate other legitimate interests in the criminal trial process.'"  LaJoie, 217 F.3d at 668 (quoting Michigan v. Lucas, 500 U.S. 145, 149, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991)); see also Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009)(defendant's right to present relevant evidence is subject to reasonable restrictions such as evidentiary and procedural rules); Green v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002)("[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'")(quoting United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998))(emphasis in original). Thus, showing that excluded evidence was relevant is not enough to demonstrate a due process violation: the exclusion must have rendered

-14-

1  the trial fundamentally unfair.

2      Here, the California Supreme Court did not commit constitutional

3  error in rejecting either of Petitioner's challenges to the trial

4  court's evidentiary decisions.  First, the record reveals that

5  Petitioner was permitted to conduct extensive cross-examinations of

6  both deputy Sanchez and deputy Martin.  [See RT at 2182-66, 2275-80,

7  2406-75.]  During those examinations, Petitioner repeatedly questioned

8  the deputies about their observations, their reasons for stopping him,

9  and their actions as they related to the arrest and the subsequent

10  recovery of the gun.  [Id.]  Although the trial court on several

11  occasions prohibited Petitioner from reading the deputies' prior

12  testimony into the record, the court repeatedly explained that it

13  would permit Petitioner to use the deputies' prior testimony if he

14  could show that the prior testimony and the current testimony were

15  inconsistent.  [See, e.g., RT at 2242, 2248-49, 2407-10, 2421.]  When

16  Petitioner established the requisite inconsistency on a material

17  point, the trial court, in fact, allowed him to use prior testimony to

18  impeach the deputies.  [See, e.g., RT at 2191-92, 2276-77, 2421-22,

19  2468-69; see also RT at 2472.]

20      Moreover, the trial court did not "abruptly" end Petitioner's

21  cross-examination of either witness.  Although the court ended the

22  cross-examination of the witnesses, it did so only after repeatedly

23  admonishing Petitioner to refrain from asking questions that had

24  already been asked and to refrain from ignoring the court's rulings on

25  restricted areas of cross-examination.[4]  [See, e.g., RT at 2265-67,

26

27      [4]  The court instructed the jury not to draw conclusions from its
    comments about Petitioner's use of time or the fact that objections to

28                                                    (continued...)

2450-51, 2461, 2465-66, 2467, 2474.]

Second, the trial court did not render Petitioner's trial unfair by refusing to allow Petitioner to cross-examine the deputies about the MDT and their use of police code numbers to communicate with the Sheriff's department dispatcher.  According to Petitioner, the excluded evidence would have shown that the deputies had testified falsely about both why they initially stopped Petitioner and when the arrest occurred.  [RT at 2288-89.]  However, the exclusion of this evidence could not have been prejudicial because both deputies testified that they did not contact their dispatch until after they had recovered the firearm from Petitioner.  [RT at 2108, 2208, 2289.]  By that time, Petitioner had admitted to carrying a loaded firearm and was, by any measure, a suspicious person.  Thus, the excluded evidence would not have contradicted or cast doubt upon the deputies' testimony about why they initially stopped Petitioner.  Furthermore, despite the court's rulings, Petitioner was permitted to question – and in fact questioned – the deputies about the timing of his arrest and when the deputies communicated with dispatch.  [See RT at 2208, 2262-64, 2291-92, 2467-70; see also RT at 2180-81, 2210.][5]  Again, during closing argument, Petitioner emphasized that the deputies never communicated with dispatch about the traffic violation, but instead informed

---

[4]  (...continued)
his questions had been sustained.  It further instructed the jury to decide the case based on the evidence it received.  [RT at 2268.]

[5]  Petitioner also complains that he was not permitted to question the deputies about how the gun they recovered was booked into evidence.  However, the record shows that Petitioner elicited testimony from both deputies on this issue.  [See, e.g., RT at 2253, 2254-57, 2461-65, 2454-55.]  Also, there is no merit to Petitioner's claim that he was not allowed to question deputy Sanchez about when and why deputy Sanchez drew his weapon.  [See RT at 2439-40.]

1   dispatch that they were stopping a suspicious person.  [RT at 3122.]

2       Finally, even assuming that the trial court erred in restricting

3   the cross-examination of the deputies, Petitioner cannot show that the

4   error had a substantial and injurious impact on the jury's verdict.

5   Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L.

6   Ed. 2d 353 (1993)(constitutional error will not warrant habeas relief

7   unless error "'had substantial and injurious effect or influence in

8   determining the jury's verdict'")(citation omitted).  Both deputies

9   testified that they recovered a loaded gun from Petitioner and that

10  Petitioner twice admitted to them that he was carrying a gun.  [RT at

11  2169, 2271.]  None of the matters on which Petitioner was prevented

12  from questioning the witnesses would have called into question the

13  credibility and weight of this testimony.  Moreover, none of the

14  proposed cross-examination would have established a motive on the

15  deputies' part to fabricate the events surrounding the arrest.

16  Indeed, both deputies testified that they had never seen Petitioner

17  before the arrest, and one officer testified that the deputies were

18  unaware of his prior criminal record when they arrested him.  [RT at

19  2180, 2274.]

20      Accordingly, Petitioner suffered no prejudice from either the

21  trial court's restrictions on his cross-examination of the deputies or

22  the court's decision to exclude evidence on the MDT and the use of

23  police codes.[6]  Petitioner, therefore, is not entitled to habeas

24

25      [6]  As part of his challenge to the trial court's restriction of
    his ability to cross-examine the deputies, Petitioner also faults the
26  trial court for refusing to allow Petitioner to call two witnesses who
    would have testified that police had planted weapons on them.
27  However, as Petitioner admitted at trial, neither incident involved
    the deputies who arrested Petitioner.  [RT at 425-28.]  Thus, even if
28                                                      (continued...)

1   relief on this ground.

2        **C.   CLAIM THREE - RIGHT TO REPRESENTATIVE JURY**

3        In Claim Three, Petitioner contends that he was denied his Sixth

4   Amendment right to a jury representing a fair cross-section of the

5   community.[7]  Specifically, he asserts that the jury venire in his case

6   lacked a sufficient number of African-American jurors to constitute a

7   fair cross section of the community.  In support of this argument,

8   Petitioner notes that, of the 120 potential jurors in his case, only

9   four were African-American.  [Traverse at 26.]  Citing demographic

10  statistics, Petitioner concludes that, in his case, there should have

11  been at least thirteen African-Americans among the potential jurors.

12  [Id.][8]

13       A criminal defendant has a Sixth Amendment right to a fair and

14

15  _____

16       [6]  (...continued)
    the jury would have credited the proposed witnesses' testimony, it
17  would not have undermined the credibility of the deputies.

18       [7]  Respondent contends that Claims Three, Four, Six, Nine,
    Thirteen, Sixteen, Twenty, Twenty-three, and Twenty-four are
19  procedurally barred.  Because these claims fail on the merits, there
    is no need to address procedural bar.  See Lambrix v. Singletary, 520
20  U.S. 518, 524-525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997)(in the
    interest of judicial economy federal court may address merits of
21  allegedly defaulted claim on if the issues are clear on the merits but
    not on procedural default); Walters v. Maass, 45 F.3d 1355, 1360 n.6
22  (9th Cir. 1995)(same).  Respondent also contends that some claims are
    unexhausted.  This court may deny a petition containing unexhausted
23  claims when it is "perfectly clear" that the unexhausted claims are
    meritless.  Granberry v. Greer, 481 U.S. 129, 135, 107 S. Ct. 1671, 95
24  L. Ed. 2d 119 (1987); see also Cassett v. Stewart, 406 F.3d 614,
    623-624 (9th Cir. 2005).  Here, it is "perfectly clear" that the
25  claims in question are meritless.

26       [8]  In Claim Twenty-one, Petitioner asserts that the state
    violated his rights under the Sixth Amendment's Vicinage Clause by
27  trying him in the Los Angeles Superior Court in Torrance, rather than
    in the Los Angeles Superior Court in Inglewood.  [Traverse at (iii).]
28  To the extent that Petitioner relies on his right to a vicinage jury
    in Claim Three, that argument is addressed under Claim Twenty-one.

impartial jury pool composed of a cross section of the community. <u>See</u>
<u>Holland v. Illinois</u>, 493 U.S. 474, 476, 110 S. Ct. 803, 107 L. Ed. 2d
905 (1990); <u>Duncan v. Louisiana</u>, 391 U.S. 145, 148-58, 88 S. Ct. 1444,
20 L. Ed. 2d 491 (1968). In <u>Duren v. Missouri</u>, 439 U.S. 357, 367, 99
S. Ct. 664, 58 L. Ed. 2d 579 (1979), the Supreme Court held that to
establish a prima facie violation of the fair cross section
requirement, a defendant must establish three things: (1) the group
alleged to be excluded is a "distinctive" group in the community; (2)
the group was not fairly represented in the venire from which the
petit jury was chosen; and (3) the underrepresentation resulted from a
systematic exclusion of the group in the jury selection process. A
Sixth Amendment prima facie case does not require a showing of
discriminatory intent or that the defendant is a member of the
excluded group.[9] <u>See</u> <u>United States v. Esquivel</u>, 88 F.3d 722, 725-26
(9th Cir. 1996).

Here, Petitioner has not established a prima facie case that he
was denied a jury pool composed of a cross section of the community.[10]
As an initial matter, Petitioner has not established that any African-

---

[9]  A claim of systematic exclusion of members of a particular
ethnic group from a jury panel can also support a violation of equal
protection even when the number of members of the group in the
relevant population is small. <u>See</u> <u>Castaneda v. Partida</u>, 430 U.S. 482,
494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). However, Petitioner has
limited his challenge here to a Sixth Amendment challenge. Moreover,
even if Petitioner had alleged an equal protection challenge, it would
fail because Petitioner does not allege that the exclusion of African-
Americans from his jury pool resulted from a discriminatory intent.
<u>See</u> <u>Thomas v. Borg</u>, 159 F.3d 1147, 1150 (9th Cir. 1998)("In order to
establish a prima facie Fourteenth Amendment equal protection
violation in the jury selection process, a defendant also must show
discriminatory intent.").

[10]  Petitioner has established the first prong of the prima facie
test. African-Americans have been recognized as a "distinctive,"
"cognizable" group for purposes of the fair cross-section analysis.
<u>See</u> <u>United States v. Cannady</u>, 54 F.3d 544, 547 (9th Cir. 1995).

Americans were "excluded" from the jury venire.  Rather, he has, at most, established only that the venire selected for his trial contained a lesser percentage of African-Americans than believed to reside in the community at large.

Moreover, assuming without deciding that Petitioner has shown that African-Americans were not fairly represented in the venire from which the petit jury was chosen, he has not shown that the resulting underrepresentation resulted from a systematic exclusion of African-Americans in the jury selection process.  Although Petitioner maintains that the selection process should have included more people from the city of Inglewood (or should have included only people from Inglewood), Inglewood is merely one part of the Southwest District of the Los Angeles Superior Court.[11]  Petitioner has cited no way in which the random selection of jurors within that district resulted in a systemic exclusion of African-Americans.  See Cal. Code Civ. Proc. § 198(a)(requiring that "selection shall be utilized in creating master and qualified juror lists, commencing with selection from source lists, and continuing through selection of prospective jurors for voir dire"); see also Randolph v. California, 380 F.3d 1133, 1141 (9th Cir. 2004)(despite underrepresentation of Hispanic jurors in jury pool no prima facie case because no evidence that underrepresentation resulted from county's system of assembling jury venire).  In any event, according to Petitioner, the random selection of jurors ensures that people from Inglewood are selected once every other draw.

_____

[11]   According to the Los Angeles County Superior Court's website, the Southwest District includes three different courthouses, one in Torrance, one in Inglewood, and one in Redondo Beach.  See http://www.lasuperiorcourt.org/locations/ui/listbyDist.aspx, last visited on December 2, 2010.

[Traverse at 29.]

Habeas relief is not merited on this claim.

**D.    CLAIM FOUR – JUROR MISCONDUCT**

In Claim Four, Petitioner contends that he was denied his right to an impartial jury because a juror engaged in prejudicial misconduct.  Specifically, Petitioner contends that, during trial, but before deliberations had begun, a juror was overheard criticizing Petitioner's testimony to another juror.  Allegedly, the juror stated the following: "Damn, he was stupid[.]  I would have never testified for myself[.]  [H]e's [fucking] up on testimony[.]  [H]e sounds stupid[.]  [H]e [fucked] up."  [Aug. CT at 5-7.]  Petitioner maintains that this deprived him of his right to a jury trial by an impartial jury because it shows that at least one juror had predetermined his guilt.

The Sixth Amendment guarantees every criminal defendant a right to an impartial jury.  <u>Duncan v. Louisiana</u>, 391 U.S. 145, 149, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968); <u>Cook v. LaMarque</u>, 593 F.3d 810, 826 (9th Cir. 2010).  Accordingly, "[e]ven if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  <u>United States v. Eubanks</u>, 591 F.2d 513, 517 (9th Cir. 1979)(internal quotation marks omitted).  Not every instance of juror misconduct, however, requires a new trial.  <u>United States v. Klee</u>, 494 F.2d 394, 396 (9th Cir. 1974).

In addressing allegations of juror misconduct, courts distinguish between outside contact influencing the verdict and pre-deliberation discussion among jurors.  In <u>Mattox v. United States</u>, 146 U.S. 140, 150, 151, 13 S. Ct. 50, 36 L. Ed. 917 (1892), the Supreme Court held that "[p]rivate communications, possibly prejudicial, between jurors

-21-

1   and third persons, or witnesses, or the officer in charge, are

2   absolutely forbidden, and invalidate the verdict, at least unless

3   their harmlessness is made to appear." Subsequently, in Remmer v.

4   United States, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954),

5   the Court established that any "private communication, contact, or

6   tampering, directly or indirectly, with a juror during a trial about

7   the matter pending before the jury" is deemed "presumptively

8   prejudicial." In Remmer, the Court placed a heavy burden on the

9   government to rebut the presumption by proving the error harmless

10  beyond a reasonable doubt. Id.

11      In contrast, premature deliberations among jurors gives rise to

12  no such presumption because they are "not as serious as" private

13  communication, outside contact, or tampering. Davis v. Woodford, 384

14  F.3d 628, 653 (9th Cir. 2004). "What is crucial is not that jurors

15  keep silent with each other about the case but that each juror keep an

16  open mind until the case has been submitted to the jury." Id. at 653

17  (internal quotation marks omitted). Thus, unless premature

18  deliberations deprive a petitioner of a fair trial, they will not

19  warrant habeas relief. Belmontes v. Brown, 414 F.3d 1094, 1124-25

20  (9th Cir. 2005), overruled on other grounds by, Ayers v. Belmontes,

21  549 U.S. 7, 127 S. Ct. 469, 166 L. Ed. 2d 334 (2006).

22      Here, assuming that the misconduct occurred,[12] it did not violate

23  Petitioner's right to an impartial jury. Although the juror's comment

24  violated the prohibition on pre-deliberation discussions about the

25  case, nothing about the statement suggests that the juror who made it

26

27      [12] The trial court ordered an investigation into Petitioner's
    allegations of juror misconduct, and concluded that no misconduct
28  occurred. [See RT at 4802, 4826.]

-22-

had predetermined Petitioner's guilt.  Rather, the isolated statement merely represented one juror's impression about one aspect of the evidence to which all the jurors were exposed.  Cf. Belmontes, 414 F.3d at 1125 (stating, without deciding, that juror's pre-deliberation comments suggested that he had predetermined defendant's guilt because juror uttered "[h]ere comes the killer" every time defendant entered courtroom).  Although Petitioner maintains that the juror's comment raised a presumption of prejudice, that presumption does not apply here because the comment involved no outside contact with the jurors.  Rather, the conduct at issue here involved a single comment between two jurors about Petitioner's testimony.

In short, Petitioner has not shown that the juror's pre-deliberation comment deprived him of his right to a fair trial, and federal habeas relief is not available on this claim.

### E.   CLAIMS FIVE AND TWENTY-FIVE – PETITIONER'S PRIOR CONVICTION

Petitioner asserts two separate yet related claims about a prior conviction that the trial court found to be a serious felony.  First, in Claim Five, Petitioner contends that the trial court violated his right to due process when it denied his request for discovery on the record of his 1993 conviction for assault with a firearm.  Although Petitioner contends that he required the requested records to challenge whether his 1993 conviction qualified as a serious felony under California law, he does not explain how the records would have enabled him to make that challenge.  Second, in Claim Twenty-five, Petitioner contends that the trial court denied him due process by refusing to hear his argument that his 1993 conviction for assault with a deadly weapon did not qualify as "strike" under California's Three Strikes Law.  Petitioner raised both of these claims in a habeas

-23-

petition which the California Supreme Court denied without comment. [Lodged Docs. E2, E6.]

These claims lack merit for two reasons. First, the record shows that Petitioner did, in fact, argue before the court at the sentencing hearing that his 1993 conviction did not qualify as a strike. [RT at 4829.] Although Petitioner may have wanted to elaborate on this challenge to the 1993 conviction, he nevertheless was permitted to articulate it. Specifically, he argued that the 1993 conviction did not qualify as a strike because it resulted from a plea agreement, and, therefore, no proof existed to show that he actually committed the conduct for which he was convicted. [See RT at 4830-31.]

Second, Petitioner cannot show that the trial court would have reached a different conclusion about his prior conviction had he been permitted discovery or additional argument. His challenge to the factual basis underlying his 1993 conviction was foreclosed by long-standing Supreme Court precedent: "A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. United States v. Broce, 488 U.S. 563, 569, 109 S. Ct. 757, 102 L. Ed. 2d 927 (1989). Thus, by pleading guilty, a defendant admits the facts constituting the elements of the charge. See United States v. Cazares, 121 F.3d 1241, 1246 (9th Cir. 1997)("It has long been settled that a guilty plea is an admission of all the elements of a formal criminal charge.")(citations and quotations omitted). "Any attempt to contradict the factual basis of a valid plea must fail." United States v. Morrison, 113 F.3d 1020, 1021 (9th Cir. 1997)(defendant's guilty plea to firearm use precluded him from arguing that he did not, in fact, use a firearm); see also United States v. Matthews, 833 F.2d

-24-

161, 165 (9th Cir. 1987)("Matthews seeks to avoid his sentence on the ground that an allegation in the indictment . . . is contradicted by the evidence.  By pleading guilty to the indictment, however, Matthews conclusively admitted the allegation.").[13]

Moreover, the abstract of judgment in Petitioner's 1993 conviction for assault with a deadly weapon conclusively shows that the conviction was a serious felony under California law.  See People v. Delgado, 43 Cal. 4th 1059, 1065, 77 Cal. Rptr. 3d 259 (2008) (abstract of judgment with notation "Asslt w DWpn" was sufficient for trial court to find that defendant's conviction for assault under California Penal Code § 245(a)(1) was serious felony because notation showed Petitioner used deadly weapon in committing assault); cf. People v. Rodriquez, 17 Cal. 4th 253, 261-62, 70 Cal. Rptr. 2d 334 (1998)(abstract of judgment of assault under California Penal Code 245(a)(1) insufficient to show conviction was "serious" felony because crime could have been committed in ways that did or did not constitute "serious" felony and abstract did not indicate how defendant committed crime).  The abstract of judgment for the 1993 conviction states that, in committing the assault, Petitioner used a deadly weapon and personally caused great bodily injury to another.  [CT at 488.] Accordingly, the conviction was for a "serious" felony under

---

[13]  Although Petitioner maintains that he pleaded "no contest," as opposed to guilty, to the 1993 assault charge, this fact is inconsequential.  In California, the legal effect of a no contest plea is the "same as that of a plea of guilty for all purposes."  Cal. Penal Code § 1016; see also People v. Bradford, 15 Cal. 4th 1229, 1374-75, 65 Cal. Rptr. 2d 145 (1997)(same); Hudson v. United States, 272 U.S. 451, 47 S. Ct. 127, 129, 71 L. Ed. 347 (1926)(plea of nolo contendere is treated as admission of guilt in federal court). Accordingly, to the extent that Petitioner sought discovery of the 1993 plea transcript to show that he pleaded no contest, that discovery would not have affected the trial court's finding that the 1993 conviction qualified as a serious felony.

California law.  <u>See</u> Cal. Penal Code § 1192.7(c)(8)(any felony in which defendant personally inflicts great bodily injury on person other than accomplice is a serious felony), § 1192.7(c)(23)("any felony in which the defendant personally used a dangerous or deadly weapon" is a serious felony), § 1192(c)(31)("assault with a deadly weapon" is a serious felony).  And on cross examination, Petitioner admitted that the 1993 conviction was for assault with a firearm.  [RT at 3073 ("Q: And you have a conviction for assault with a firearm from January 27 of 1993; correct?  A: Yes, ma'am.").]  Consequently, any argument that the 1993 conviction did not qualify as a serious felony would have failed.[14]

Accordingly, federal habeas relief is not available on either of Petitioner's claims about whether his 1993 conviction was a serious felony under California law.

**F.   CLAIM SIX – DUAL USE OF FACTS**

In Claim Six, Petitioner contends that he is entitled to a new sentence because the sentence imposed violates California's statutory prohibition against using the same facts to both impose a sentence and enhance it.  Specifically, Petitioner faults the trial court for using his prior felony convictions to enhance his sentence because the crime for which he was sentenced – being a felon in possession of a firearm – required the jury to find that Petitioner was convicted of the three prior felonies he was alleged to have committed.  Petitioner maintains that, because the jury found those prior felony allegations true in

---

[14]   Petitioner does not contend that he was never convicted of the crimes that the trial court cited as prior strikes.  On the contrary, he admitted that had been convicted of those crimes.  [RT at 3073 (Petitioner admitting on cross-examination that he was previously convicted of assault with a firearm and forcible rape in concert).]

-26-

1  reaching its verdict, the court was prohibited from using the same

2  prior convictions to sentence him under the Three Strikes Law.

3      A state prisoner is entitled to federal habeas corpus relief only

4  if he is held in custody in violation of the Constitution, laws, or

5  treaties of the United States.  See 28 U.S.C. § 2254(a); Estelle, 502

6  U.S. at 67-68.  The Ninth Circuit has consistently held that, absent a

7  showing of fundamental unfairness, habeas relief is unavailable for

8  error in the interpretation or application of state sentencing laws.

9  See, e.g., Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994);

10 Cacoperdo v. Demosthenes, 37 F.3d 504, 506 (9th Cir. 1994); Hendricks

11 v. Zenon, 993 F.2d 664, 674 (9th Cir. 1993); Miller v. Vasquez, 868

12 F.2d 1116, 1118-19 (9th Cir. 1989).  To the extent that Petitioner

13 merely challenges California's application of its own sentencing laws,

14 this claim is not cognizable on federal habeas review.

15      Here, nothing suggests that the sentencing court misapplied

16 California law or that the sentence was fundamentally unfair.  In

17 California, "when a prior conviction constitutes an element of

18 criminal conduct which otherwise would be noncriminal, the minimum

19 sentence may not be increased because of the indispensable prior

20 conviction."  People v. Edwards, 18 Cal. 3d 796, 800, 135 Cal. Rptr.

21 411 (1976)(emphasis added).  This rule, however, is inapplicable here

22 because the conduct committed by Petitioner – carrying a concealed,

23 loaded firearm in public – was criminal.  See Penal Code § 12031(a)(1)

24 (prohibiting carrying loaded firearm in public).

25      Moreover, even if the dual use rule was implicated, the resulting

26 sentence did not violate California law.  Penal Code section 1170.12

27 (c)(2)(A) provides that persons with two prior violent or serious

28 felony convictions shall be subject to the specified longer sentences,

1   including, as in this case, a sentence of twenty-five years to life.
2   Subsection (c) prefaces subdivision (c)(2)(A) with the caveat that it
3   applies "in addition to any other enhancements or punishment
4   provisions which may apply. . . ." (Emphasis added.) Subsection
5   (d)(1) further provides that, "[n]otwithstanding any other provision
6   of law, this section shall be applied in every case in which a
7   defendant has a prior felony conviction as defined in this section."
8   Penal Code § 1170.12(d)(1)(emphasis added). Citing the clarity of
9   this language, the California Supreme Court has held that, "[o]n its
10  face, the plain and unambiguous language of the Three Strikes law
11  discloses an intent to impose the enhanced . . . sentence despite a
12  possible 'dual use' of defendant's prior conviction." People v.
13  Garcia, 25 Cal. 4th 744, 757, 107 Cal. Rptr. 2d 355 (2001)(affirming
14  sentence when prior conviction was used as both "strike" and element
15  of offense). Thus, the sentence comported with California law.

16      In any event, Petitioner has not shown that the trial court
17  double-counted any of his prior convictions. The jury found true that
18  Petitioner suffered three prior felony convictions. [RT at 3602; CT
19  at 560.] Only one such felony was needed to establish the requisite
20  felony to convict Petitioner of being a felon in possession of a
21  firearm. The trial court could have imposed Petitioner's sentence
22  under the Three Strikes Law by relying on his prior convictions for
23  assault with a deadly weapon and rape in concert, while relying on his
24  remaining prior felony conviction to establish the requisite element
25  for his current conviction.

26      Thus, Petitioner is not entitled to habeas relief on this claim.
27  **G.   CLAIM SEVEN — THE POLICE DEPARTMENT'S HANDLING OF EVIDENCE**
28      In Claim Seven, Petitioner contends that the sheriff's department

-28-

1   denied him due process by intentionally failing to preserve

2   fingerprints on the gun the police recovered from him.  Petitioner

3   reasons that, if the department had preserved the fingerprint

4   evidence, it would have shown that he never touched the gun.

5   Consequently, Petitioner concludes that the evidence would have shown

6   that the deputies planted the gun on him.

7        The relevant background for this claim is as follows.  Before

8   trial, Petitioner sought the results of fingerprint testing the police

9   conducted on the gun the arresting deputies recovered from Petitioner.

10  [RT at B2.]  The prosecutor, however, indicated no such testing had

11  occurred.  [RT at B3.]  Relying on what she represented as the latest

12  information available to her, the prosecutor stated that the gun was

13  tested only to determine if it was operable.  [Id.]  During that

14  testing, any potential fingerprints would have been destroyed;

15  accordingly, the gun was not submitted for fingerprinting.  [Id.]

16       Petitioner then interjected that, in fact, the gun had been

17  tested for fingerprints.  [RT at B3-4.]  Rather than attempt to

18  resolve the conflict, the trial court held the matter over for a later

19  hearing.  Petitioner, thereafter, filed a motion to dismiss based on

20  purported destruction of evidence.  [CT at 180-86; RT at F23.]

21       At the subsequent hearing on the matter, the prosecutor presented

22  the testimony of two witnesses: (1) a sheriff's department's

23  fingerprint expert and (2) a fingerprint technician who had earlier

24  spoken with someone who had called on Petitioner's behalf seeking the

25  results of fingerprint testing.  [RT at F3-F22.]  Although Petitioner

26  was permitted to present additional testimony, he elected against

27  doing so.  [RT at F22.]

28       The department's fingerprint expert testified that, after

-29-

Petitioner was arrested, the deputies submitted a request for the gun to be tested for fingerprints. [RT at F9.] No fingerprints were found on the gun. [Id.] This testimony was not contradicted by any evidence or testimony. The technician testified that she had informed someone calling on Petitioner's behalf that no fingerprints had been found on the gun. [RT at F16.] No testimony was presented to contradict this testimony. Citing the lack of conflicting testimony and lack of any evidence that any fingerprints ever existed, the trial court denied Petitioner's motion. [RT at F27-29.]

At trial, the fingerprint expert who examined the gun testified that he was unable to find any viable fingerprints on the gun. [RT at 2479.] The expert further testified that it was not unusual that no prints were found. [Id.] He explained that fingerprints are found on only six to nine percent of firearms tested for fingerprints. [RT at 2482.]

Citing the lack of fingerprints on the gun, Petitioner contends that the department must have destroyed the fingerprints that would otherwise have been found on the gun. In support of this contention, Petitioner notes that, at a minimum, the gun should have carried the fingerprints of the deputies that took the gun from Petitioner. That no such fingerprints were recovered, according to Petitioner, shows that the deputies must have intentionally wiped the gun clean of fingerprints. Petitioner asserts that this destruction of evidence violated his due process rights because, in his view, the fingerprint evidence was critical. Specifically, he notes that there was conflicting testimony on whether or not he ever had the gun in question, and, therefore, the preservation of fingerprint evidence would have led the jury to believe his testimony and reject that of

-30-

the deputies.   Petitioner raised this claim in a habeas petition which the California Supreme Court denied without comment.   [Lodged Docs. E2, E6.]

Generally, law enforcement officials have a duty to preserve and collect "evidence that might be expected to play a significant role in the suspect's defense."  California v. Trombetta, 467 U.S. 479, 488, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); Miller v. Vasquez, 868 F.2d 1116, 1120 (9th Cir. 1989)(bad faith failure to collect potentially exculpatory evidence would violate Due Process Clause).  However, this duty to preserve or collect evidence applies only to "material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence from other sources."  Cooper v. Calderon, 255 F.3d 1104, 1113 (9th Cir. 2001)(citing Trombetta, 467 U.S. at 489).   In addition, the failure to preserve or collect potentially exculpatory evidence rises to a due process violation only when the "criminal defendant can show bad faith."  Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988); Miller, 868 F.2d at 1120-21.

Here, the state court did not commit constitutional error in rejecting Petitioner's destruction of evidence claim.  First, as the trial court concluded, nothing supports Petitioner's premise that any evidence was actually destroyed.  [RT at F25-27.]  The trial court reached this conclusion only after conducting a hearing on the matter, at which both sides were permitted to present and examine witnesses about the fingerprint testing that was conducted.  [RT at F3-29.]  The hearing testimony established that no fingerprints were recovered from the gun.  [RT at F9.]  Despite having the opportunity to do so,

-31-

1   Petitioner was unable to present any evidence that there were
2   fingerprints on the gun.  The trial court's finding that no evidence
3   was destroyed is presumed to be correct.  See Cooper, 255 F.3d at 1114
4   (trial court's finding that officers acted in good faith and did not
5   destroy evidence binding because no exception to binding nature of
6   trial court finding applies).

7        Second, assuming that any fingerprints ever existed, nothing,
8   other than Petitioner's bald assertions, suggests that they would have
9   had any exculpatory value.  Although Petitioner speculates that they
10  would supported his defense, they might just as easily have shown that
11  he in fact handled the gun.  Two deputies testified that they
12  recovered the gun from Petitioner and that he admitted that he was a
13  carrying a gun. [See RT at 2169, 2271.]  This strong inculpatory
14  evidence was undercut, if at all, only by the fact that no
15  fingerprints were recovered from the gun.  Thus, the lack of
16  fingerprints arguably offered a windfall to Petitioner, allowing him
17  to note and highlight the prosecution's failure to offer any
18  fingerprints tying him to the gun.  [See, e.g., RT at 3116, 3135-43.]
19  This argument might well have been unavailable had the alleged
20  fingerprint evidence been preserved.  Accordingly, Petitioner has not
21  and cannot show how the failure to preserve the purported fingerprint
22  evidence prejudiced his defense.  See Paradis v. Arave, 954 F.2d 1483,
23  1488 (9th Cir. 1992) (failure to preserve evidence that only might
24  have exonerated defendant does not constitute due process violation),
25  vacated and remanded on other grounds, 507 U.S. 1026, 113 S. Ct. 1837,
26  123 L. Ed. 2d 463 (1993).

27       Finally, nothing suggests that the officials acted in bad faith.
28  Rather, assuming there were any viable fingerprints on the gun, they

-32-

could have been destroyed either when the firearm was tested to see if it was operable or during the recovery of the gun.[15]  As to the latter, the prosecutor's fingerprint expert testified that officers can inadvertently destroy fingerprints while securing weapons and ensuring officer safety.  [See RT at 2735-36.]  Further, he found nothing unusual about the lack of fingerprint evidence in this case.  [RT at 2479, 2481-82.]  As to the former, Petitioner cites no evidence that police intended to destroy any fingerprint evidence when testing the gun to see if it was operable.  Accordingly, habeas relief is not warranted with respect to this claim.

**H.  CLAIM EIGHT – THE PROSECUTOR'S PEREMPTORY STRIKES**

In Claim Eight, Petitioner contends that the prosecutor exercised improper peremptory challenges against two African-American jurors and one juror believed to be African-American in violation of People v. Wheeler, 22 Cal. 3d 258, 148 Cal. Rptr. 890 (1978), and Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

**1.  Background**

During jury selection two African-American jurors, Juror Nos. 2016 and 2987, were placed in the jury box and questioned. Juror No. 2987 stated that she would hold police officers to higher standards than other witnesses and that she believed police engage in racial profiling.  [RT at 1556-58.]  When the prosecutor exercised a peremptory challenge on Juror No. 2987, Petitioner objected, and the court stated that it would address the matter later.  [RT at 1566.]

Juror No. 2016 stated that she was an insurance agent and that

---

[15]  There is no definitive way to know whether any prints ever existed or, if they did, how they were destroyed.  Nevertheless, the fingerprint expert testified about a number of reasons that might explain the lack of fingerprints.  [See, e.g., RT at 2480-81, 2772.]

her residence was in Inglewood.  [RT at 1535.]  Juror No. 2016 further indicated she believed police officers were human and were capable of lying but she would apply the same standard to police officers as to other people.  [RT at 1556.]  After further questioning of other jurors, the prosecutor challenged Juror No. 2016.  Petitioner once again objected, and the court again indicated the matter would be addressed later.  [RT at 1584.]

Later on the same day, Juror No. 3378 was placed in the jury box and questioned.  [RT at 1586.]  She stated that she lived in Harbor City, was a customer relations manager at an auto dealership, and was married to a software support specialist who used to be a corrections officer in Texas.  [RT at 1587.]  She also stated that she had no prior jury experience.  [RT at 1587.]

Voir dire was not concluded by the end of the day.  [RT at 1609.]  Accordingly, the trial court dismissed the potential jurors for the evening and, thereafter, addressed Petitioner's objections to the prosecutor's peremptory challenges of Juror Nos. 2987 and 2016.  [RT at 1610.]  The court held that the reasons for the prosecutor's challenge to Juror No. 2987 were readily apparent, given the juror's statements about police engaging in racial profiling and about holding police officers to a higher standard than other witnesses.  [RT at 1610-11.]  As to Juror No. 2016, the court stated it could not see any reason for her excusal, but also stated it could not discern any pattern to the use of the peremptory challenges.  [RT at 1611.]

Although the court found no pattern of discrimination [RT at 1612], it nevertheless permitted the prosecutor to state her reasons for challenging Juror No. 2016.  In response, the prosecutor stated:

In terms of the actual positive information that she gave,

-34-

1    she said that she was single, no children, no prior jury

2    experience and for the record I also exercised challenges

3    against (prospective juror 7729) and (prospective juror

4    9708) who similarly had - was not married, had no jury

5    experience and no children and also I happen to notice that

6    (Juror No. 2016), when one of the jurors, (prospective juror

7    0391) mentioned that he felt that officers generally told

8    the truth, kind of rolled her eyes and when Juror Number 13,

9    (prospective juror 6974), mentioned he also felt that

10   officers were generally credible, seemed to purse her lips

11   somewhat.

12   [RT at 1612.]

13   The court noted that it did not observe either of the instances

14   to which the prosecutor referred.  Nevertheless, the court found the

15   prosecutor's statement credible, stating "I didn't see that, but I

16   accept your representation."  [RT at 1612-13.]  Petitioner challenged

17   the prosecutor's explanation and asserted that Juror No. 2016 made no

18   such gestures.  [RT at 1613.]  Petitioner then stated, "But another

19   thrust of my position with regard to this <u>Wheeler</u> issue is the fact

20   there has only been two African-American jurors in the entire panel

21   out of forty."  [RT at 1613.]

22   At this point, the court referred to Juror No. 3378.  [RT at

23   1613.]  Specifically, the court stated it was trying to determine if

24   Juror No. 3378 was African-American, Asian, or a combination thereof.

25   [<u>Id.</u>]  In response, Petitioner assured the court that Juror No. 3378

26   was not African-American.  [<u>Id.</u>]  She was, according to Petitioner, a

27   Native American.  [<u>Id.</u>]  Petitioner was sure of this because he,

28   himself, was half Native American was able to identify the distinctive

-35-

1  marks of a Native American on Juror No. 3378. [Id.]

2      Apparently accepting Petitioner's word as definitive, the court
3  informed Petitioner that the presence of only two African-American's
4  on the jury was "just the luck of the draw." [RT at 1613.] After
5  Petitioner acknowledged that he understood, court was adjourned for
6  the evening. [RT at 1614.]

7      The next morning, jury selection continued. [RT at 1801-02.]
8  Later that morning, the prosecutor exercised a peremptory challenge
9  against Juror No. 3378. [RT at 1858.] Petitioner again objected [RT
10 at 1858], and the trial court took up Petitioner's objection at the
11 next recess. [RT at 1874.] During the ensuing hearing, Petitioner
12 argued that Juror No. 3378 fell within his previous Wheeler challenge
13 because the prosecutor might view her as being African-American.[16] [RT
14 at 1875.]

15     The court, however, observed that the prosecutor had exercised
16 many challenges, some of which the court did not see the need for, but
17 the use of challenges was up to the prosecutor. [RT at 1875-76.] The
18 court further noted that there was one African-American left on the
19 panel. [RT at 1877.] The trial court then observed again that Juror
20 No. 3378 appeared to be Asian and that Petitioner had maintained that
21 Juror No. 3378 was not African-American. [RT at 1879-80.] Citing
22 these facts, the trial court found no prima facie case of
23 discrimination. [RT at 1880.]

24     Despite this finding, the court allowed the prosecutor to state
25 her reasons for challenging Juror No. 3378. The prosecutor first

26

27     [16] Petitioner accused the prosecutor of exercising illegal
28 peremptory challenges in Petitioner's first trial, but the trial court
   refused to consider what happened in the first trial. [RT at 1875.]

-36-

1   explained that she had "no way of knowing what [Juror No. 3378's] race

2   was so the challenge could hardly be racially motivated." [RT at

3   1880.] She then noted that Juror No. 3378 "appeared perhaps to be

4   Asian." [RT at 1880.] After the court agreed that Juror No. 3378's

5   racial make-up was unclear, the prosecutor continued as follows:

6          Your Honor, as with several other people that I excused, and

7          you've already noted that I excused, and you've already

8          noted that I've excused several, I've exercised 13

9          peremptories --

10        . . .

11        People of varying backgrounds at least as one could tell

12        from their names and general appearances and as with several

13        of the other people, body language came somewhat into play.

14        And (Juror No. 3378) seemed reluctant to make eye-contact

15        with me when I was looking out at the jurors. Also, whether

16        [sic] I was standing outside to wait to come into the

17        courtroom she appeared to me to be uncomfortable to make eye

18        contact with me, and I just felt that that was not –

19   [RT at 1881-82.]

20     At this point, the trial court interrupted the prosecutor and

21   concluded that Petitioner had failed to establish a prima facie case

22   of discrimination. [RT at 1882.] In so concluding, the court stated

23   that the prosecutor had offered reasons "which sound reasonable to me

24   for exercising the peremptory." [RT at 1882.]

25     Jury selection ended the next day. The record is silent as to

26   whether there were any other African-Americans potential jurors, other

27   than the one African-American juror that the trial court identified as

28   being on the panel. Likewise, the record is silent on whether any

1  African-American jurors served on Petitioner's jury.  However, after

2  the jury reached its verdict, Petitioner stated that there had been

3  five African-American jurors on the panel from which the jury was

4  selected.  [RT at 4820.]

5      **2.  Legal Standard**

6      Purposeful discrimination on the basis of race or gender in the

7  exercise of peremptory challenges violates the Equal Protection Clause

8  of the United States Constitution.  See Batson, 476 U.S. at 85.  A

9  challenge to a peremptory strike under Batson involves a three-step

10  analysis.  First, the movant must make a prima facie case showing that

11  the prosecutor engaged in a discriminatory use of a peremptory

12  challenge.  Id. at 96-97.  Second, the burden then shifts to the

13  prosecutor to articulate a race-neutral explanation for the challenge.

14  Id. at 97-98.  Third, the court must determine whether the movant has

15  established purposeful discrimination.  Id. at 98.

16      To establish a prima facie case under Batson, the claimant must

17  show three things: (1) the prospective jurors at issue were members of

18  a cognizable group, in this case African-Americans; (2) the prosecutor

19  used peremptory challenges to remove them; and (3) the facts and

20  relevant circumstances raise an inference that the challenges were

21  motivated by race.  Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th

22  Cir. 2001); see also Powers v. Ohio, 499 U.S. 400, 410-16, 111 S. Ct.

23  1364, 113 L. Ed. 2d 411 (1991); Batson, 476 U.S. at 96.

24      Here, in affirming, on direct appeal, the trial court's ruling

25  that Petitioner had failed to establish a prima facie case, the court

26  of appeal stated that no prima facie case of discrimination exists

27  unless the defendant shows a "strong likelihood" that the prospective

28  jurors were excluded because of their group association.  [Opinion at

-38-

1   4.][17]

2          The Ninth Circuit, however, has held that the "strong likelihood"

3   standard in Wheeler violates the Constitution because it is more

4   stringent than the "reasonable inference" standard of Batson.   See

5   Wade v. Terhune, 202 F.3d 1190, 1197 (9th Cir. 2000); see also Johnson

6   v. California, 545 U.S. 162, 164, 125 S. Ct. 2410, 162 L. Ed. 2d 129

7   (2005)(state requirement that moving party show it was "more likely

8   than not" that peremptory challenges were motivated by race is

9   inappropriate yardstick by which to measure sufficiency of prima facie

10  case of discrimination in jury selection).   The Wade panel stated that

11  "[t]he 'strong likelihood' phrase conveys the clear message that the

12  test is not an easy one," whereas "the Batson framework was intended

13  significantly to reduce the quantum of proof previously required of a

14  defendant who wished to raise a claim of racial bias in the jury

15  selection procedure."   Wade, 202 F.3d at 1197 (citations omitted).

16  Thus, California courts, in following the "strong likelihood" language

17  of Wheeler, were not applying the correct legal standard for a prima

18  facie case under Batson.   Id.; see also Cooperwood v. Cambra, 245 F.3d

19  1042, 1046 (9th Cir. 2001)("[T]he [strong likelihood] standard . . .

20  does not accord with the one announced in Batson, which merely

21  requires that there be a 'reasonable inference' that the peremptory

22  challenge is being used on the basis of race.").

23          Because the California Court of Appeal applied an incorrect

24  standard of review, this court reviews Petitioner's Wheeler challenge

25

26

27         [17]   Petitioner also raised this claim in a habeas petition which
    the California Supreme Court denied without comment.   [Lodged Docs. E2
28  E6.]

-39-

1   de novo.[18]   See Wade, 202 F.3d at 1197 ("In such a case, we need not –
2   indeed, should not – give deference to their determination that a
3   defendant has failed to establish a prima facie case of bias . . . we
4   review Petitioner's Batson claims de novo."); see also Cooperwood, 245
5   F.3d at 1047.

6        **3.   Prima Facie Case**

7        Once a prosecutor has provided a race-neutral explanation for the
8   peremptory challenges in question, the preliminary issue of whether a
9   prima facie showing has been made becomes moot.   See Hernandez v. New
10  York, 500 U.S. 352, 359. 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).
11  This is because, by articulating the reasons for exercising the
12  peremptory challenge, the prosecutor does all that would be required
13  had a prima facie case been established.   Id.; see also United States
14  Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.
15  Ct. 1478, 75 L. Ed. 2d 403 (1983)(stating, in context of employment
16  discrimination, "Where the defendant has done everything that would be
17  required of him if the plaintiff had properly made out a prima facie
18  case, whether the plaintiff really did so is no longer relevant.   The
19  district court has before it all the evidence it needs to decide
20  whether 'the defendant intentionally discriminated against the
21  plaintiff.'")(citations omitted); Stubbs v. Gomez, 189 F.3d 1099,
22  1104-05 (9th Cir. 1999)(preliminary issue of prima facie case was moot
23  because court held evidentiary hearing at which prosecutor provided
24  explanations for exercising peremptory challenges and district court
25  found explanations to be race-neutral); Rankins v. Carey, 141 F. Supp.
26  2d 1231, 1238-1239 (C.D. Cal. 2001)(prima facie issue moot even though

27

28      [18]   For simplicity's sake, Petitioner's Wheeler challenge is
        referred to here as a Batson challenge.

                                    -40-

1   state court never ruled on ultimate question of purposeful

2   discrimination), <u>overruled on other grounds by</u> 36 Fed. Appx. 296 (9th

3   Cir. 2002); <u>Hart v. Dexter</u>, 2008 WL 2224542, *24 (C.D. Cal. May 29,

4   2008)(same).

5        Here, the question of whether Petitioner established a prima

6   facie case of discrimination is moot.  In response to both of

7   Petitioner's <u>Batson</u> challenges, the prosecutor articulated reasons for

8   challenging the jurors at issue.[19]  Nothing more was required of her to

9   meet her burden had the trial court found a prima facie case had been

10  established.  <u>See</u> <u>Aikens</u>, 460 U.S. at 715.  Although the trial court

11  never reached the ultimate question of purposeful discrimination,[20] it

12  nonetheless found that the prosecutor's proffered reasons were valid.

13  <u>See</u> <u>Stubbs</u>, 189 F.3d 1104-05.  Accordingly, the remaining two prongs

14  of the <u>Batson</u> test should be addressed.

15       **4.   <u>Race-Neutral Reasons</u>**

16       Once a defendant establishes a prima facie case of racial

17  discrimination, the burden of production shifts to the prosecution to

18  provide a race-neutral explanation for the challenge.  <u>Wade</u>, 202 F.3d

19  at 1195; <u>see</u> <u>also</u> <u>Purkett v. Elem</u>, 514 U.S. 765, 767, 115 S. Ct. 1769,

20  131 L. Ed. 2d 834 (1995); <u>McClain v. Prunty</u>, 217 F.3d 1209, 1220 (9th

21

22       [19]  The prosecutor never articulated a reason for striking Juror
23  No. 2987.  However, Petitioner does not challenge the prosecutor's
    decision to strike that juror; his <u>Batson</u> claim is directed solely at
24  the prosecutor's decision to strike Juror Nos. 2016 and 3378.

25       [20]  In <u>Hernandez</u>, the trial court reached the ultimate issue of
    purposeful discrimination.  500 U.S. at 359.  Although the Supreme
26  Court cited this fact in reaching its holding that the prima facie
    case issue was moot, it first cited <u>Aikens</u> with approval for the
27  proposition that the prima facie issue becomes moot once the non-
    moving party does what would be required of it had a prima facie case
28  been established.  <u>Hernandez</u>, 500 U.S. at 359 (stating that the
    principle of <u>Aikens</u> "applies under <u>Batson</u>").

Cir. 2000).  "A neutral explanation in the context of our analysis
here means an explanation based on something other than the race of
the juror."  Hernandez, 500 U.S. at 360.  "The second step of this
process does not demand an explanation that is persuasive, or even
plausible.  'At this [second] step of the inquiry, the issue is the
facial validity of the prosecutor's explanation.  Unless a
discriminatory intent is inherent in the prosecutor's explanation, the
reason offered will be deemed race neutral.'"  Purkett, 514 U.S. at
768 (quoting Hernandez, 500 U.S. at 360).  The prosecutor need not
offer reasons that make sense, but only reasons that do not violate
equal protection.  Id. at 769.  At this stage, the prosecutor's
reasons can be "silly" or "implausible."  Id. at 768.

        Here, the prosecutor offered race-neutral reasons for striking
both Juror No. 2016 and Juror No. 3378.  First, the prosecutor
explained that she struck Juror No. 2016 because she rolled her eyes
and made other facial expressions when other jurors testified that
they believed police officers were generally believable.  The
prosecutor also noted that Juror No. 2016 was single, had no children,
and had no prior jury experience.  None of these articulated reasons
implicated Juror No. 2016's race; as such, each reason is race-
neutral.  Second, the prosecutor explained that she struck Juror No.
3387 because Juror No. 3387 refused to make eye-contact with the
prosecutor during questioning or outside the courtroom.  This too was
a sufficiently race-neutral reason for striking Juror No. 3387.  See
Snyder v. Louisiana, 552 U.S. 472, 477, 128 S. Ct. 1203, 170 L. Ed. 2d
175 (2008)("race-neutral reasons for peremptory challenges often
invoke a juror's demeanor"); Stubbs, 189 F.3d at 1105 (demeanor and
lack of eye contact were sufficiently race-neutral reasons to meet

1   burden to articulate race-neutral reasons for striking juror); <u>see</u>
2   <u>also</u> <u>United States v. Thompson</u>, 827 F.3d 1254, 1260 (9th Cir. 1987)
3   (prosecutor stated race-neutral reason for excluding juror when
4   prosecutor said that juror glared at prosecutor and appeared sullen).

5        Accordingly, the prosecutor's explanations for striking the two
6   jurors in question were race-neutral and satisfied the government's
7   burden of articulating nondiscriminatory reasons for the strikes.   <u>See</u>
8   <u>Batson</u>, 476 U.S. at 96.

9        **5.   <u>Purposeful Discrimination</u>**

10       At the final step of the <u>Batson</u> test, the reviewing court must
11  determine whether the petitioner satisfied the ultimate burden of
12  proving that the prosecutor engaged in purposeful discrimination in
13  striking either one of the challenged jurors at issue.  <u>See</u> <u>Purkett</u>,
14  514 U.S. at 768; <u>see also</u> <u>Batson</u>, 476 U.S. at 98.  To do so, the
15  petitioner must show that the prosecutor's decision to strike either
16  juror was "motivated in substantial part by discriminatory intent."
17  <u>Cook</u>, 593 F.3d at 814.  In deciding if the petitioner carried this
18  burden, the court "must undertake a sensitive inquiry into such
19  circumstantial and direct evidence of intent as may be available."
20  <u>Batson</u>, 476 U.S. at 93.

21       "This inquiry includes 'side-by-side comparisons'" of the African
22  American panelists who were struck with the non-African-American
23  panelists who were allowed to serve.  <u>Cook</u>, 593 F.3d at 815.  "If a
24  prosecutor's proffered reason for striking a black panelist applies
25  just as well to an otherwise-similar nonblack who is permitted to
26  serve, that is evidence tending to prove purposeful discrimination to
27  be considered at <u>Batson</u>'s third step." <u>Miller-El v. Dretke</u>, 545 U.S.
28  231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).  The Supreme

1    Court has cautioned, however, that "a retrospective comparison of
2    jurors based on a cold appellate record may be very misleading when
3    alleged similarities were not raised at trial." <u>Snyder</u>, 552 U.S. at
4    483.  Accordingly, reviewing courts "must be mindful that an
5    exploration of the alleged similarities at the time of trial might
6    have shown that the jurors in question were not really comparable."
7    <u>Id.</u>

8        The trial court also plays a "pivotal role" at step three of the
9    <u>Batson</u> inquiry.  <u>Snyder</u>, 552 U.S. at 477.  This is because "[s]tep
10   three of the <u>Batson</u> inquiry involves an evaluation of the prosecutor's
11   credibility, and 'the best evidence [of discriminatory intent] often
12   will be the demeanor of the attorney who exercises the challenge.'"
13   <u>Id.</u> (<u>quoting</u> <u>Hernandez</u>, 500 U.S. at 365)(internal citation omitted).
14   Accordingly, the Supreme Court recognized that "determinations of
15   credibility and demeanor lie 'peculiarly within a trial judge's
16   province' and are entitled to deference "'in the absence of
17   exceptional circumstances.'" <u>Snyder</u>, 552 U.S. at 477.  Moreover, this
18   "deference is especially appropriate where a trial judge has made a
19   finding that an attorney credibly relied on demeanor in exercising a
20   strike." <u>Id.</u> at 479.

21        **a.   Juror No. 2016**

22        Petitioner has not met his burden to show that the prosecutor
23   engaged in purposeful discrimination by striking Juror No. 2016.  In
24   explaining her reasons for striking Juror No. 2016, the prosecutor
25   stated that she had observed Juror No. 2016 rolling her eyes and
26   making facial gestures when other potential jurors stated that they
27   believed officers generally tell the truth.  Although the trial court
28   did not witness this conduct, it nevertheless found that the

-44-

1   prosecutor was credible and accepted her representation as true.   [RT

2   at 1612-13; see also RT at 1878 ("I have no reason to believe that

3   [the prosecutor] is lying to me. . . .").]

4        The trial court's credibility finding is entitled to deference.

5   The trial court had the opportunity to observe the prosecutor's

6   demeanor; having done so, the court found her credible.   This court

7   should not second-guess that finding, and Petitioner points to no

8   exceptional circumstances that would permit this court to do so.

9   Moreover, the trial court's finding is no less entitled to deference

10  simply because the trial court did not witness Juror No. 2016's

11  conduct.   See Thaler v. Haynes, __ U.S. __, 130 S. Ct. 1171, 1175

12  (2010)(judge's acceptance of prosecutor's proffered reasons for

13  striking juror based on demeanor entitled to deference even when trial

14  court did not personally witness juror's demeanor).   Moreover, a

15  comparative analysis supports the prosecutor's justification for

16  striking Juror No. 2016.   The prosecutor did not allow any other juror

17  who expressed skepticism about the credibility of police officers to

18  serve on the jury.

19       Furthermore, none of the prosecutor's other stated reasons for

20  striking Juror No. 2016 suggest that the decision to strike Juror No.

21  2016 was substantially motivated by an intent to discriminate against

22  African-Americans.   Aside from Juror's No. 2016's demeanor, the

23  prosecutor noted that Juror No. 2016 was single, had no kids, and had

24  no prior jury experience.   Although it appears that the prosecutor was

25  willing to accept two jurors that likewise were single, had no kids,

26

27

28

                              -45-

1  and had never served on a jury (Juror Nos. 8602 and 9708),[21] neither of

2  those two potential jurors indicated in any way that they believed

3  police officers lacked credibility.  [See RT at 1541, 1565.]

4      Additionally, unlike Juror No. 2016, both of the seemingly

5  comparable jurors potentially suggested a willingness to convict

6  someone accused of a crime involving firearms.  For example, Juror No.

7  8602 had a relative who died as a result of being shot in the head.

8  [RT at 1525.]  Similarly, Juror No. 9708 indicated that he or she was

9  against gun use in general.  [RT at 1565-66.]  Given these facts,

10 neither juror was sufficiently comparable to Juror No. 2016 to prove

11 that the prosecutor's decision to strike Juror No. 2016, while

12 allowing the other two jurors to serve, was motivated by a

13 discriminatory intent.  See Snyder, 552 U.S. at 483.[22]

14     **b.   Juror No. 3378**

15     Petitioner has not met his burden to show that the prosecutor

16 engaged in purposeful discrimination by striking Juror No. 3378.

17 Indeed, the prosecutor stated that she did not know Juror No. 3378's

18 race; accordingly, the prosecutor could not have discriminated against

19 Juror No. 3378 on the basis of race.  Furthermore, nothing in the

20 record suggests that the prosecutor merely feigned ignorance about

21 Juror No. 3378's race.  On the contrary, the trial court could not

22

23     [21]  After the prosecutor accepted the panel, Petitioner struck
     Juror No. 9708.  [RT at 1913.]

24     [22]  The prosecutor did not spend an inordinate amount of time
25 questioning Juror No. 2016 or subject Juror No. 2016 to questions that
     the prosecutor did not ask of others.  See Cook, 593 F.3d at 825
26 (prosecutor's consistency in questioning African-American and white
     jurors undermined suggestion that prosecutor engaged in purposeful
27 discrimination); cf. Miller-El, 545 U.S. at 255-63 (prosecutor's
     questioning of African-American jurors more closely than white jurors
28 supported conclusion that prosecutor's stated reasons for striking
     African-American jurors were pretextual).

determine Juror No. 3378's race and opined that the juror may have been Asian.  Petitioner, himself, insisted that Juror No. 3378 was not African-American.  Given these circumstances, there is nothing in the record to support Petitioner's assertion that the prosecutor excluded Juror No. 3378 to rid the jury of African-Americans.

Moreover, no evidence suggests that the prosecutor's articulated reason for excluding Juror No. 3378 – that he or she was incapable of making eye contact with the prosecutor – was a mere pretext.  On the contrary, the prosecutor asserted, without contradiction, that she had excluded several potential jurors because of concerns about body language.  [RT at 1881.]  Having heard the prosecutor's explanation, the trial court concluded that it was "reasonable."  Again, this finding is entitled to deference.

Because Petitioner cannot meet his burden to show that the prosecutor engaged in purposeful discrimination by striking either of the two jurors in question, his <u>Batson</u> claim fails.  Accordingly, habeas relief is not warranted on this claim.

### I.   CLAIM NINE – PETITIONER'S SENTENCE

In Claim Nine, Petitioner contends that his sentence was unconstitutional because it was imposed based on facts not found by the jury.  Specifically, Petitioner faults the trial court for sentencing Petitioner under California's Three Strikes Law without first having the jury determine that, in fact, Petitioner's prior convictions were serious or violent felonies.  Petitioner submits that this error would have been avoided if the trial court would have, as requested, instructed the jury with CALJIC 17.45.  In pertinent part, CALJIC 17.45 states as follows:

1     It is alleged that before the commission of the crimes

2     charged in the information, the defendant was convicted of

3     certain felonies.

4     The defendant has denied the truth of the allegation.

5     In this case, you must first decide the question of

6     whether defendant is guilty of the crimes charged.

7     . . . .

8     If you find the defendant not guilty as to the crimes

9     charged in the information, it will not be necessary to

10    determine whether the allegations of the prior convictions

11    are true.

12    If you find the defendant guilty of the crimes charged

13    in the information, you must determine whether the

14    allegations of the prior convictions are true.

15    The People have the burden of proving the truth of the

16    allegations.  If you have a reasonable doubt that they true,

17    you must find them to be not true.

18    You are instructed that the defendant is the person

19    whose name appears on the documents admitted to establish

20    the convictions.

21  Cal. Jury Instr., Crim. 17.45.

22  The court of appeal rejected this claim on direct appeal.

23  [Opinion at 11-14.]  In so doing, the court of appeal noted that the

24  jury was already instructed that it had to determine whether

25  Petitioner had been convicted of, and served prison sentences for,

26  prior felonies.  The jury explicitly found that Petitioner had three

27  prior felony convictions and that he had served prison terms for each

28  conviction.  Furthermore, the court of appeal observed that Petitioner

admitted having suffered three prior convictions. Accordingly, the court of appeal found that the trial court did not err in declining to instruct the jury with CALJIC 17.45. As to whether the prior convictions were serious for purposes of the Three Strikes Law, the court of appeal explained that it was not within the jury's province to decide that question; rather, it was for the court to decide. As such, the trial court committed no error in sentencing Petitioner under California's Three Strikes Law. As explained below, the court of appeal reasonably rejected Petitioner's challenge to his sentence.

As the Supreme Court has repeatedly held, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond a prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); see also Cunningham v. California, 549 U.S. 270, 275, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007); United States v. Booker, 543 U.S. 220, 244 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

Applying the rule of Apprendi, the Supreme Court held in Blakely that a kidnapper's enhanced sentence based on the trial court's disputed finding of "deliberate cruelty" violated the kidnapper's right to trial by jury. Blakely, 542 U.S. at 313-14 (Washington state sentencing procedure permitting judge to impose sentence above the "standard range" if the judge finds "substantial and compelling reasons justifying an exceptional sentence" does not comply with Sixth Amendment). The Court reasoned that the sentence was unconstitutional because it could not have imposed solely on the basis of the facts admitted in the kidnapper's guilty plea. Id. at 303-04.

-49-

Here, Petitioner's sentence did not run afoul of <u>Apprendi</u>.  The sentence was based solely on the jury's findings and Petitioner's admissions.  The jury found Petitioner guilty of possession of a firearm by a felon, which is a felony under California law.  [RT at 3601-02; CT at 558.]  The jury also found that Petitioner had suffered three prior felony convictions, including convictions for rape in concert and assault with a deadly weapon.  [RT at 3601-03; CT at 558-60.]  Furthermore, Petitioner admitted that he had been convicted of both crimes and that the assault conviction was for assault with a firearm.  [RT at 3073.]  Under California law, both crimes qualified as serious felonies for purposes of the Three Strikes Law.  <u>See</u> Cal. Penal Code § 1192.7(c)(3)(identifying rape as a serious felony); § 1192.7(c)(31)(identifying "assault with a deadly weapon" as a serious felony).  Based on these facts, the trial court did not err in concluding that Petitioner's prior convictions were qualifying strikes and sentencing Petitioner under the Three Strikes law.[23]

**J.   CLAIMS ELEVEN, FOURTEEN, AND FIFTEEN – PROSECUTORIAL MISCONDUCT**

Petitioner contends that the prosecutor committed several acts of misconduct.  In Claim Eleven, Petitioner asserts that the prosecutor denied him a fair trial by signaling answers to a prosecution witness being cross-examined by Petitioner.  In Claim Fourteen, Petitioner

---

[23]   In Claim Twenty-five, Petitioner separately contends that the trial court erred in refusing to allow Petitioner to argue that his assault conviction did not qualify as a serious felony.  That claim is discussed above.  Here, however, any error the trial court may have committed in finding that Petitioner's assault conviction was a serious felony would be harmless for the reasons explained in the discussion of Claim Twenty-five.  <u>See</u> <u>Washington v. Recuenco</u>, 548 U.S. 212, 220-22, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)(sentencing errors in violation of Sixth Amendment are not structural and are subject to harmless error analysis).

1  faults the prosecutor for vouching for the credibility of two deputies

2  who testified against Petitioner.  In Claim Fifteen, Petitioner

3  contends that the prosecutor improperly inflamed the passions and

4  prejudices of the jury by invoking a recent incident in which an

5  officer was killed during a routine traffic stop, and by accusing

6  Petitioner of "conning" and "playing" the jury.  Petitioner raised

7  each of these claims in a habeas petition which the California Supreme

8  Court denied without comment.  [Lodged Docs. E2, E6.]

9       Prosecutorial misconduct does not rise to the level of a

10  constitutional violation unless it "so infected the trial with

11  unfairness as to make the resulting conviction a denial of due

12  process."  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464,

13  91 L. Ed. 2d 144 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S.

14  637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)); Comer v. Schriro,

15  480 F.3d 960, 988 (9th Cir. 2007); Drayden v. White, 232 F.3d 704, 713

16  (9th Cir. 2000).  "[T]he touchstone of due process analysis in cases

17  of alleged prosecutorial misconduct is the fairness of the trial, not

18  the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209,

19  219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); see also Estelle v.

20  Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976)

21  ("The right to a fair trial is a fundamental liberty secured by the

22  Fourteenth Amendment.").  Here, none of Petitioner's claims of

23  prosecutorial misconduct warrants habeas relief.

24       **1.   Signaling the Witness (Claim Eleven)**

25       In the course of cross-examining Deputy Sheriff Sanchez,

26  Petitioner accused the prosecutor of signaling the witness.  [RT at

27  2420.]  Petitioner asked the trial court to order the prosecutor to

28  refrain from any further such activity.  [Id.]  The court did not

1   credit Petitioner's accusation, but nevertheless admonished all

2   parties to refrain from signaling witnesses.  [RT at 2420-21.]  After

3   the jury reached its verdict, Petitioner's friend, Linda McDaniel,

4   submitted a declaration in which she claimed to have seen the

5   prosecutor signaling the witness.  [Aug. CT at 2-4.]

6       Even if the prosecutor signaled the witness, Petitioner would not

7   be entitled to habeas relief because he suffered no prejudice from the

8   prosecutor's alleged misconduct.  A review of the transcript reveals

9   that Petitioner was cross-examining the witness on an inconsequential

10  matter when Petitioner made his accusation.  Specifically, Petitioner

11  was cross-examining the witness about what terminology the officer

12  used to describe a pedestrian walk sign on the corner where Petitioner

13  was arrested.  [RT at 2420.]  That line of questioning had little, if

14  anything, to do with the main issue in the case – namely, whether

15  Petitioner was carrying a loaded firearm.[24]  Thus, regardless of

16  whether the prosecutor actually signaled the witness, the alleged

17  signaling could not have so infected the trial with unfairness so as

18  to deny Petitioner his right to a fair trial.

19      Moreover, even though the trial court did not credit Petitioner's

20  accusations, it nevertheless took steps prevent potential misconduct.

21  See Greer v. Miller, 483 U.S. 756, 765-66, 107 S. Ct. 3102, 3109, 97

22  L. Ed. 2d 618 (1987)(sequence of single question, immediate objection,

23  and curative instruction "clearly" indicated prosecutor's improper

24  question did not violate due process); Turner v. Marshall, 63 F.3d

25  807, 817 (9th Cir. 1995)(curative actions by trial court when

26

27      [24]  On that point, two deputies testified that Petitioner
    admitted he was carrying a firearm and that they found a loaded
28  firearm when they searched him.  [RT at 2169, 2271.]

confronted by improper comments "are usually presumed to neutralize damage such that any error was harmless"), <u>overruled on other grounds by Tolbert v. Page</u>, 182 F.3d 677 (9th Cir. 1999)(<u>en banc</u>).  Here, the trial court admonished both parties that signaling witnesses was prohibited.  [RT at 2420-21 <u>see also id.</u> at 2451.]

Thus, Petitioner is not entitled to habeas relief on this claim.

## 2.   <u>Vouching (Claim Fourteen)</u>

Petitioner contends that the prosecutor improperly vouched for the credibility of the two deputies who testified about how they found a loaded firearm on Petitioner and about the incriminating statement Petitioner made regarding his possession of the firearm. Specifically, Petitioner faults the prosecutor for arguing during closing arguments that the deputies "didn't lie and make up" a compelling, "fantastic" story for the jury and that they were "honest."  [<u>See</u> Traverse at 71 (citing RT at 3302, 3308).] Furthermore, Petitioner complains that the prosecutor pointed out that the court had found on several occasions that nothing about the deputies' testimony contradicted their earlier testimony in Petitioner's first trial, which was declared a mistrial.  [Traverse at 71, citing RT at 3308.]  Petitioner claims that these instances of alleged misconduct deprived him of a fair trial.

A prosecutor is permitted to argue reasonable inferences from the evidence, <u>see</u>, <u>e.g.</u>, <u>Ceja v. Stewart</u>, 97 F.3d 1246, 1253-54 (9th Cir. 1996); <u>Duckett v. Godinez</u>, 67 F.3d 734, 742 (9th Cir. 1995); and to label a witness's testimony as lies or fabrication.  <u>See</u>, <u>e.g.</u>, <u>Turner</u>, 63 F.3d at 818.  A prosecutor may not, however, vouch for the credibility of a prosecution witness.  <u>See</u>, <u>e.g.</u>, <u>United States v. Young</u>, 470 U.S. 1, 18-19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985);

1    <u>United States v. Jackson</u>, 84 F.3d 1154, 1158 (9th Cir. 1996).

2    "Vouching may occur in two ways: the prosecution may place the

3    prestige of the government behind the witness or may indicate that

4    information not presented to the jury supports the witness's

5    testimony."  <u>United States v. Roberts</u>, 618 F.2d 530, 533 (9th Cir.

6    1980)(<u>citing</u> <u>Lawn v. United States</u>, 335 U.S. 339, 359-60 n.15, 78

7    S.Ct. 311, 2 L. Ed. 2d 321 (1958); <u>United States v. Lamerson</u>, 457 F.2d

8    371 (5th Cir. 1972)); <u>United States v. Weatherspoon</u>, 410 F.3d 1142,

9    1146 (9th Cir. 2005).

10        An example of the first of these two forms of impermissible

11   vouching occurs when the prosecutor asserts that a prosecution witness

12   is honest.  <u>See</u> <u>Hein v. Sullivan</u>, 601 F.3d 897, 913 (9th Cir. 2010)

13   (prosecutor improperly vouched for witness's credibility when

14   prosecutor argued, among other things, that witness "was painfully

15   honest" and that witness's testimony incriminating Petitioner was

16   "honest" despite revealing embarrassing things about the witness);

17   <u>United States v. Weatherspoon</u>, 410 F.3d 1142, 1146 (9th Cir. 2005)

18   (prosecutor improperly vouched for testifying officers by arguing that

19   they had no reason to lie and that, if they lied, they would risk

20   being prosecuted for perjury).

21        Here, with one possible exception, the prosecutor's comments did

22   not constitute improper vouching.  Although Petitioner is correct that

23   the prosecutor noted that the officer's were "honest," Petitioner

24   ignores the context of the prosecutor's statements.  The prosecutor

25   did not assert that the witnesses's entire testimonies were truthful;

26   instead, the prosecutor noted that the deputies honestly answered

27   questions that were damaging to the prosecution's case, rather than

28

1   fabricate details.[25]   To the extent that the prosecutor noted that the

2   deputies had no motive to lie [RT at 3302],[26] such argument was proper

3   in light of Petitioner's closing argument.   Petitioner's closing

4   argument centered on the contention that the deputies lied when they

5   testified about what they recovered from Petitioner and about what

6   Petitioner said to them.   [See, e.g., RT at 3118-3123, 3146-47.]

7   Given this line of argument, the prosecutor could not have deprived

8   Petitioner of a fair trial by noting the absence of any evidence

9   suggesting a motive to lie.   In fact, jury instructions required the

10  jury to consider whether a witness had any motive to lie in

11  determining whether that witness was credible.   [RT at 3321; CT at

12  506.]

13      Although Petitioner cites one instance where the prosecutor

14

15  _____

16      [25]   See RT at 3302 ("And if [the deputies] were going to lie, why
    not make up a better story?   Why not tell you there was no jacket at
17  all? . . .   Yeah, [Petitioner] was wearing the jacket, and it was
    bulkier than it was in court.   They said what they saw.   They didn't
18  lie and make up some better, fantastic story for you."); RT at 3308
    ("How was the deputies' testimony?   They were polite to the defendant.
19  They answered the questions.   They got a little frustrated at some of
    the redundant or frustrating questions.   If they didn't know the
20  answer, they said they didn't know.   If they didn't remember, they
    said they didn't remember.   They didn't just guess at something so
21  they could have an answer.   They were honest.   It's been nine months.
    There were some things they didn't remember.").

22      [26]   The prosecutor argued as follows to counter Petitioner's
23  argument that the officers fabricated everything about his arrest and
    the recovery of the gun: "Let's look at the deputies.   You heard
24  absolutely no evidence that they lied, and you certainly didn't hear
    any reason why they would.   Why would these deputies who don't know
25  the defendant – even the defendant said he had never seen them before.
    They don't know anything about him.   It's not like the defendant is Al
26  Capone or anything like that and that they have been waiting to get
    him for some reason and they were in some special unit and targeting
27  him.   No.   They were just two deputies who were on patrol.   Why would
    they risk their career, their likelihood [sic] to pin something on the
28  defendant?   It just doesn't make sense. [¶] And if they were going to
    lie, why not make up a better story? . . ."   [RT at 3301-02.]

1    seemingly argued that the deputies were honest [RT at 3310],[27] this

2    instance was not sufficient to deprive Petitioner of a fair trial.

3    The prosecutor's statement was isolated, and the jury was instructed

4    that it was not to consider attorneys' statements as evidence.  [RT at

5    3316; CT at 499]; see Duckett, 67 F.3d at 743 (assuming prosecutor's

6    comment was improper, no constitutional violation occurred based on

7    isolated moment in trial where jury was properly instructed that

8    statements of attorneys were not evidence).  Moreover, the prosecutor

9    made this isolated comment shortly after properly explaining to the

10   jury what it could consider in assessing the credibility of the

11   witnesses.  [See RT at 3304-06.]

12       Finally, the prosecutor's comments could not have deprived

13   Petitioner of a fair trial in light of the evidence presented against

14   him.  See Hein, 601 F.3d at 916 (denying habeas relief despite

15   prosecutor's improper vouching for witness, in part, because evidence

16   against petitioner was strong).  Two deputies testified that

17   Petitioner admitted to carrying a firearm, and the deputies found a

18   loaded firearm on Petitioner.  [RT at 2169, 2271.]  The purported

19   vouching was aimed at these two witnesses.  However, Petitioner

20   offered no credible evidence at trial suggesting that the witnesses

21   were lying or had any motive to lie.  Cf. United States v. Rudberg,

22   122 F.3d 1199, 1206 (9th Cir. 1997)(reversing conspiracy conviction

23   against defendant based entirely on testimony of vouched witnesses

24   when defendant denied participating in conspiracy, vouched witnesses

25   were subject to credibility attacks, and defendant was able to

26

27       [27]  The prosecutor said: "The deputies are not on trial.  They
28   just came in here and told you what they did and were honest with you
     about it."  [RT at 3310.]

-56-

1  corroborate his testimony denying participation).  Aside from this
2  lack of evidence, Petitioner's testimony conflicting with that of the
3  deputies was subject to several credibility problems.  Indeed, he
4  admitted that he had suffered three prior felony convictions and had
5  served multiple prison sentences.  Moreover, he testified that he was
6  intoxicated when approached by the deputies.  [See RT at 3065-66.]
7  Given these circumstances, there is no reason to believe that the
8  prosecutor's comments deprived Petitioner of a fair trial.

9      Thus, Petitioner is not entitled to habeas relief on this claim.

10     **3.    Inflaming Jury's Passion and Prejudice (Claim Fifteen)**

11     Petitioner contends that the prosecutor inflamed the jury's
12  passions and prejudices by pursuing two lines of argument.  First,
13  Petitioner faults the prosecutor for equating Petitioner to a gang
14  member who gunned down a police officer during a routine traffic stop.
15  Specifically, Petitioner contends that the following statement was
16  improper: "We all heard about what happened in Irwindale on just a
17  regular traffic stop." [RT at 3309.]  The prosecutor made this
18  statement in the context of addressing Petitioner's challenge to the
19  way in which the arresting officer handled the firearm taken from
20  petitioner when he was arrested.  [RT at 3309.]  Just before making
21  the allegedly offensive statement, the prosecutor argued: "Why did the
22  officer handle the gun the way he handled it?  Well, because officer
23  safety is first and foremost and has to be in a situation like that."
24  [RT at 3309.]  Petitioner submits that the prosecutor's invocation of
25  the well known officer murder in Irwindale roused the jury's passions
26  and prejudice and caused them to convict Petitioner based on those
27  emotions, rather than on the facts of the case.

28     Second, Petitioner contends that the prosecutor compounded this

improper argument by labeling Petitioner a "con man," accusing him of trying to "play" the jury and suggesting that he was "desperate." According to Petitioner, these arguments pitted Petitioner against the jury, thereby prejudicing the jury against him.

A prosecutor does not commit misconduct by asking the jury in closing arguments to make reasonable inferences from the evidence at trial, even if the defendant disputes those inferences. See United States v. Cabrera, 201 F.3d 1243, 1250 (9th Cir. 2000); United States v. Patel, 762 F.2d 784, 795 (9th Cir. 1985)("When a prosecutor's remarks . . . constitute reasonable inferences from the evidence, no prosecutorial misconduct can be demonstrated."). Indeed, "[c]ounsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja, 97 F.3d at 1253-54. This latitude does not, however, extend to arguments calculated to arouse the jury's passions or prejudices. Viereck v. United States, 318 U.S. 236, 247-48, 63 S. Ct. 561, 87 L. Ed. 734 (1943); United States v. Leon-Reyes, 177 F.3d 816, 822 (9th Cir. 1999).

Here, the prosecutor did not overstep the wide latitude afforded counsel during closing arguments. First, the prosecutor's brief allusion to the Irwindale shooting did not constitute misconduct. Due process requires that guilt be determined only on the evidence adduced at trial, not on suspicion, defendant's status as a defendant, or facts not in evidence. Taylor v. Kentucky, 436 U.S. 478, 486-88, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978). However, "[i]t is expected that jurors will bring their life experiences to bear on the facts of a case." Hard v. Burlington N.R. Co., 870 F.2d 1454, 1462 (9th Cir.

1989)(quoting Head v. Hargrave, 105 U.S. 45, 49, 26 L. Ed. 1028
(1881)); United States v. Diabate, 317 Fed. Appx. 638, 639 (9th Cir.
Nov. 21, 2008)(jury expected to apply common sense and general
knowledge in drawing reasonable inferences from evidence at trial).
In this case, the prosecutor's reference to the Irwindale shooting was
designed only to illustrate the common sense proposition that police
officers face danger in their job.

Moreover, the record does not support Petitioner's assertion that
the prosecutor equated Petitioner to the shooter in the Irwindale
murder.  On the contrary, the prosecutor's reference to the Irwindale
murder was designed only to explain the deputies' actions.  See United
States v. Hitow, 889 F.3d 1573, 1581 (6th Cir. 1989)(disapproving of
prosecutor's closing argument reference to Al Capone, but finding no
prejudice because prosecutor did not actually compare defendant to
notorious gangster); cf. Martin v. Parker, 11 F.3d 613, 616-17 (6th
Cir. 1993)(petitioner denied right to fair trial when prosecutor
equated petitioner with Hitler because comparison created overwhelming
prejudice in jurors' eyes); United States v. Steinkoetter, 633 F.2d
719, 720 (6th Cir. 1980)(reversing conviction after prosecutor likened
defendant to Pontius Pilate and Judas Iscariot).

Finally, even assuming that the prosecutor's reference to the
Irwindale shooting was improper, it could not have impacted the jury's
verdict.  The comment was brief, consisting of only one sentence in
the prosecutor's entire closing argument.  The comment contained no
details regarding the incident, and the prosecutor never referred to
the incident again in the closing argument.  Furthermore, the jury was
instructed that it was not to consider statements of attorneys as
evidence.  [RT at 3316; CT at 499.]  And as discussed above, the

evidence against Petitioner was strong.  Given these circumstances, the prosecutor's momentary allusion to the Irwindale shooting could not have deprived Petitioner of a fair trial.  See Duckett, 67 F.3d at 743.

Second, the prosecutor did not commit misconduct by accusing Petitioner of trying to "con" or "play" the jury, or by labeling Petitioner's defense theory "desperate."  To be sure, "[a] personal attack on defense counsel's integrity [can] constitute misconduct." United States v. Santiago, 46 F.3d 885, 892 (9th Cir. 1995).  By contrast, "[c]riticism of defense theories and tactics is a proper subject of closing argument."  United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997).  Indeed, "[a] lawyer is entitled to characterize an argument with an epithet as well as a rebuttal." Williams v. Borg, 139 F.3d 737, 745 (9th Cir. 1998); see also Turner, 63 F.3d at 818.

Here, the prosecutor's comments were permissible because they were aimed at Petitioner's theory of defense.  Specifically, the prosecutor employed the language in question to challenge Petitioner's theory that two police officers with no prior history with Petitioner conspired to plant a loaded firearm on him and to falsely testify that Petitioner admitted to carrying a gun.  These comments were the type of "hard blows" permitted in closing argument.

In any event, the prosecutor's comments, even if improper, did not approximate the type of statements that have been found to establish a due process violation based on prosecutorial misconduct. See Darden, 477 U.S. at 180 n. 10-12 (prosecutor did not deprive defendant of right to fair trial when prosecutor urged jury to impose death penalty by arguing that "as far as I am concerned, . . . [the

defendant is] an animal," and "I wish [the decedent] had had a shotgun in his hand . . . and blown [the defendant's] face off.  I wish that I could see him sitting here with no face, blown away by a shotgun"); Comer v. Schriro, 480 F.3d 960, 988 (9th Cir. 2007)(prosecutor did not deny defendant a fair trial despite labeling him as "monster," "filth," and "reincarnation of the devil").  Accordingly, even if the prosecutor erred in her attempts to attack Petitioner's defense, that error did not deprive Petitioner of his right to a fair trial.

### K.   CLAIM EIGHTEEN – ADMISSION OF PETITIONER'S STATEMENT

In Claim Eighteen, Petitioner contends that the trial court denied him due process by allowing the prosecutor to put into evidence the incriminating statement that Petitioner made to police during the traffic violation stop.  When they stopped Petitioner, one of the two deputies asked Petitioner if he was carrying any contraband or weapons.  [RT at 2271.]  Petitioner replied that he was carrying a gun.  [RT at 2169, 2271.]

Petitioner asserts that his response should have been excluded from trial because it was obtained in violation of his Fifth Amendment right to silence.  Specifically, Petitioner maintains that he was in custody when police asked him if he was carrying any weapons or contraband.  Petitioner contends that police could not legally interrogate him without first advising him of his Miranda[28] rights.  Furthermore, Petitioner asserts that the statement should been excluded because he denied making it and because the prosecutor failed to establish a sufficient factual basis to believe that Petitioner made the statement.  Petitioner raised this claim in a habeas petition

---

[28] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

which the California Supreme Court denied without comment.  [Lodged Docs. E2, E6.]

In Miranda, the United States Supreme Court declared that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed."  384 U.S. at 444.  Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial.  See Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293.

An officer's duty to administer Miranda warnings, however, arises "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)(per curiam)). The reviewing court must examine the totality of the circumstances surrounding the interrogation to determine whether the person is in custody.  See Stansbury, 511 U.S. at 322.  The "ultimate inquiry," however, is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)(citations and quotations omitted).

Here, Petitioner's incriminating statement to police was properly admitted into evidence because Petitioner was not in custody when he made the statement.  When a person is temporarily detained pursuant to an ordinary traffic stop, that person is "not 'in custody'" for the purposes of Miranda."  Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.

1  Ct. 3138, 82 L. Ed. 2d 317 (1984); see also United States v. Galindo-

2  Gallegos, 244 F.3d 728, 732 (9th Cir. 2001)(defendant's statements

3  admissible despite lack of Miranda warning when border agents detained

4  defendant and questioned him on immigration status and citizenship).

5  In this case, police stopped Petitioner for crossing the street

6  against a red "don't walk" light.  [RT at 2279-80.)  Within moments of

7  being stopped, Petitioner admitted that he was carrying a weapon.  [RT

8  at 2271.]  Because he was only temporarily detained when he made this

9  incriminating statement, he was not in custody for Miranda purposes

10  and, therefore, no Miranda warnings were required.

11      Habeas relief is, therefore, not warranted on this claim.

12      **L.    CLAIMS NINETEEN AND TWENTY – JUDICIAL MISCONDUCT**

13      Petitioner asserts two separate claims of judicial misconduct.

14  First, in Claim Nineteen, Petitioner contends that the judge presiding

15  over his trial displayed hostility toward him while showing favoritism

16  toward the prosecutor.  Second, in Claim Twenty, Petitioner asserts

17  that the trial court improperly communicated with the jury.

18      The Due Process Clause requires a "fair trial in a fair tribunal"

19  before a judge with no actual bias against the defendant or interest

20  in the outcome of his or her particular case.  Bracy v. Gramley, 520

21  U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997).  However, a

22  trial judge is more than simply an umpire or referee.  A trial judge

23  may participate in the examination of witnesses to clarify evidence,

24  confine counsel by evidentiary rulings, ensure the orderly

25  presentation of evidence, and prevent undue repetition.  Duckett, 67

26  F.3d at 739.  A claim of judicial misconduct by a state judge does not

27  entitle a petitioner to federal habeas relief unless "the state trial

28  judge's behavior rendered the trial so fundamentally unfair as to

-63-

1  violate federal due process under the United States Constitution."
2  Id. at 740.   To sustain a claim of judicial misconduct on habeas
3  review, there must be an "extremely high level of interference" by the
4  trial judge that creates a "pervasive climate of partiality and
5  unfairness."  Id.

6      Here, neither of Petitioner's claims of judicial misconduct
7  warrants habeas relief.

8      **1.   Bias**

9      In Claim Nineteen, Petitioner contends that the judge presiding
10  over his trial displayed hostility toward him and showed favoritism to
11  the prosecutor.   In support, Petitioner cites twenty-five instances
12  during trial that purportedly show the trial court's bias against
13  Petitioner.   Generally, these twenty-five instances can be broken into
14  four categories: (1) showing impatience toward Petitioner and
15  addressing him in a rude manner; (2) making capricious rulings; (3)
16  interrupting Petitioner while he was examining witnesses; and (4)
17  alerting the prosecutor to object to Petitioner's questions.
18  [Traverse at 90-93.]   Petitioner raised this claim in a habeas
19  petition which the California Supreme Court denied without comment.
20  [Lodged Docs. E2, E6.]

21      To succeed on a judicial bias claim, a petitioner must "overcome
22  a presumption of honesty and integrity in those serving as
23  adjudicators."  Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456, 43
24  L. Ed. 2d 712 (1975).  "In the absence of any evidence of some
25  extrajudicial source of bias or partiality, neither adverse rulings
26  nor impatient remarks are generally sufficient to overcome the
27  presumption of judicial integrity, even if those remarks are 'critical
28  or disapproving of, or even hostile to, counsel, the parties, or their

-64-

1   cases.'"   Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008)

2   (quoting Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147,

3   127 L. Ed. 2d 474 (1994)).   As the Supreme Court has explained,

4   "opinions formed by the judge on the basis of facts introduced or

5   events occurring in the course of the current proceedings, or of prior

6   proceedings, do not constitute a basis for a bias or partiality motion

7   unless they display a deep-seated favoritism or antagonism that would

8   make fair judgment impossible."   Liteky, 510 U.S. at 555.

9       Here, none of the instances cited by Petitioner suggests that the

10   trial court was biased against Petitioner because the record shows

11   that there was no extrajudicial source of bias or partiality.

12   Instead, Petitioner cites only instances in which the trial court

13   revealed, at most, mild frustration with Petitioner's inability to

14   abide by or accept the court's rulings.   None of the instances of

15   supposed partiality cited by Petitioner warrants habeas relief.   See

16   Larson, 515 F.3d at 1057 (rejecting judicial bias claim because

17   petitioner cited no extrajudicial source of bias and record "revealed

18   little more than the occasional mild frustration with [petitioner's]

19   pro se lawyering skills"); Garrett v. Ricci, 328 Fed. Appx. 528 (9th

20   Cir. July 6, 2009)(same).

21       Moreover, nothing supports Petitioner's assertion that the trial

22   judge made whimsical rulings adverse to Petitioner.   Indeed, in the

23   one instance Petitioner cites to support this assertion [RT at 2425],

24   the court ruled in his favor.   Specifically, the court overruled the

25   prosecutor's relevance objection to a question by Petitioner.   [Id.]

26       Petitioner is not entitled to relief on this claim.

27      **2.**   **Communicating with the Jury**

28      In Claim Twenty, Petitioner accuses the trial court of improperly

1   communicating with the jury.  Specifically, Petitioner faults the
2   court for allegedly asking three testifying officers whether they were
3   carrying firearms and, thereafter, nodding to the jury.  Noting that
4   these three alleged instances occurred only when Petitioner sought to
5   cross-examine the officers, Petitioner posits that the court was
6   sending a silent message to the jury that Petitioner was a dangerous
7   person, and the jury was more inclined to reach a guilty verdict than
8   it would have been absent such conduct.

9       Petitioner cannot obtain habeas relief on this claim because it
10  is based solely on unsupported allegations.  See James v. Borg, 24
11  F.3d 20, 26 (9th Cir. 1994)("Conclusory allegations which are not
12  supported by a statement of specific facts do not warrant habeas
13  relief."); Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995)(habeas
14  relief not warranted when claims are unsupported by facts).

15      Although Petitioner cites several pages in the reporter's
16  transcript purportedly showing the trial court's misconduct, none of
17  those pages shows that the court ever inquired about whether any of
18  the three testifying officers were armed.  [See RT at 2188, 2439.]
19  And if, as Petitioner suggests, the trial court inquired out of the
20  jury's earshot about whether the officers were armed, no evidence
21  suggests that the jury heard the trial court's question.  [See RT at
22  2188.]  Nothing in the record supports Petitioner's assertion that the
23  court "nodded" to the jury after allegedly inquiring about whether any
24  officers were armed.  To the extent that the jury was exposed to any
25  of the trial court's purported communications with the officers, that
26  occurred as a result of Petitioner's questioning of one of the
27  officers.  [See RT at 2439.]  In any event, the jury could not discern
28  the context of the trial court's communications based on what

1   Petitioner revealed about those communications.  Indeed, on the

2   present record, there is no basis for discerning the context of those

3   communications.  Thus, the trial court could not have sent the jury a

4   silent message about the danger posed by Petitioner.

5       Habeas relief is not warranted on this claim.

6   **M.   CLAIM TWENTY-ONE – VICINAGE JURY**

7       In Claim Twenty-one, Petitioner contends that the state violated

8   his rights under the Sixth Amendment's Vicinage Clause by trying him

9   in the Los Angeles Superior Court in Torrance, rather than in the Los

10  Angeles Superior Court in Inglewood.  Petitioner asserts that, by

11  doing so, the court denied Petitioner his right to a jury representing

12  a cross-section of the community where the crime occurred.[29]

13  Petitioner raised this claim in a habeas petition which the California

14  Supreme Court denied without comment.  [Lodged Docs. E2, E6.]

15      The Vicinage Clause guarantees a person accused of a crime "the

16  right to a . . . jury of the State and district wherein the crime

17  shall have been committed, which district shall have been previously

18  ascertained by law."  U.S. Const. amend. VI.  Neither the Supreme

19  Court nor the Ninth Circuit has ever held that the Vicinage Clause

20  applies to states.  Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir.

21  2004).  In fact, every Federal Circuit to have addressed the issue has

22  held that the Vicinage Clause does not apply to the states.  See

23  id. (citing Caudill v. Scott, 857 F.2d 344, 345-46 (6th Cir. 1988);

24  Cook v. Morrill, 783 F.2d 593, 594-96 (5th Cir. 1986); Zicarelli v.

25  Dietz, 633 F.2d 312, 320-26 (3rd Cir. 1980)).  Citing this authority,

26

27      [29]  In Claim Three, Petitioner asserts a separate yet related
    argument that he was denied his right to jury consisting of a fair,
28  representative cross-section of the community in which the crime
    occurred.  [SAP at 6.]

1  the Ninth Circuit in <u>Stevenson</u> affirmed a district court's decision
2  denying habeas relief sought on Vicinage Clause grounds.  384 F.3d at
3  1071-72.  In doing so, the Ninth Circuit reasoned that the state
4  court's decision "was not contrary to, or an unreasonable application
5  of, clearly-established Supreme Court law, simply because no such law
6  exists."  <u>Id.</u> at 1072.

7      In light of <u>Stevenson</u>, the California Supreme Court's decision
8  denying Petitioner's Vicinage Clause was neither contrary to, nor an
9  unreasonable application of, clearly-established Supreme Court law.
10 <u>See</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d
11 482 (2006)(when Supreme Court precedent gives no clear answer to
12 question presented, "it cannot be said that the state court
13 'unreasonab[ly] appli[ed] clearly established Federal law'").  Thus,
14 federal habeas relief is not available on this claim.

15      **N.   CLAIM TWENTY-TWO – THE SEARCH OF PETITIONER**

16      In Claim Twenty-two, Petitioner contends that the trial court
17 erred in denying his motion to suppress both the evidence that police
18 recovered when they searched him and the statement that he allegedly
19 made to police before being searched.  According to Petitioner, the
20 trial court denied him a fair opportunity to litigate the motion to
21 suppress by placing the burden on Petitioner to show that he had a
22 reasonable expectation of privacy when he was stopped and searched.
23 [Traverse at 101-02.]  Petitioner raised this claim in a habeas
24 petition which the California Supreme Court denied without comment.
25 [Lodged Docs. E2, E6.]

26      A state prisoner may not invoke a Fourth Amendment ground for
27 relief on federal habeas review if the prisoner had the opportunity
28 for "full and fair" consideration of the claim in state court.  <u>Stone</u>

1    <u>v. Powell</u>, 428 U.S. 465, 494, 96 S. Ct. 3037, 49 L. Ed. 2d 1067

2    (1976).  "The relevant inquiry is whether petitioner had the

3    opportunity to litigate his claim, not whether he did in fact do so or

4    even whether the claim was correctly decided." <u>Ortiz-Sandoval v.</u>

5    <u>Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996).  The Ninth Circuit has stated

6    that even if the state court's determination of the Fourth Amendment

7    issues results in an incorrect decision, federal habeas corpus actions

8    shall not provide a remedy so long as the petitioner was afforded a

9    full and fair opportunity to litigate the issues in state court.  <u>See</u>

10   <u>Locks v. Summer</u>, 703 F.2d 403, 408 (9th Cir. 1983).

11        California provides criminal defendants with a full and fair

12   opportunity to litigate Fourth Amendment claims through the procedures

13   of Penal Code section 1538.5.  Section 1538.5 permits a defendant to

14   move to suppress evidence on the ground that it was obtained in

15   violation of the Fourth Amendment.  <u>See</u> <u>Gordon v. Duran</u>, 895 F.2d 610,

16   613-14 (9th Cir. 1990); <u>see</u> <u>also</u> <u>Locks</u>, 703 F.2d at 408 (9th Cir.

17   1983); <u>Mack v. Cupp</u>, 564 F.2d 898, 901 (9th Cir. 1977).

18        Here, Petitioner cannot maintain his challenge to the trial

19   court's resolution of his motion to suppress because he had a full and

20   fair opportunity to litigate the merits of his suppression motion at

21   the state court level.  Petitioner filed a section 1538.5 motion to

22   suppress the evidence police recovered from him and the statements he

23   made.  [CT at 163-79.]  After conducting a hearing on the matter, the

24   trial court denied the motion.  [RT at 216-21.]  The California

25   Supreme Court subsequently held that the trial court properly denied

26   the motion to suppress.  [Lodged Doc. E6.]  Because Petitioner had a

27   full and fair opportunity to litigate his Fourth Amendment claim,

28   <u>Stone v. Powell</u> bars this court from further review of this claim.

1   **O.   CLAIM TWENTY-THREE – DISCOVERY OF PERSONNEL RECORDS**

2        In Claim Twenty-three, Petitioner contends that the trial court

3   denied him due process by denying his motion for discovery of the

4   arresting deputies' personnel records.  [Traverse at 104-07.]

5   According to Petitioner, the requested discovery was relevant to the

6   deputies' credibility.  Petitioner hoped that he could buttress his

7   allegation that the deputies had fabricated the evidence against him

8   by showing that they had fabricated evidence in the past.  [See, e.g.,

9   RT at 1204 (hearing transcript on Petitioner's discovery motion).]

10       Under California law, "a criminal defendant may, in some

11  circumstances, compel the discovery of evidence in the arresting law

12  enforcement officer's personnel file that is relevant to the

13  defendant's ability to defend against a criminal charge."  People v.

14  Mooc, 26 Cal. 4th 1216, 1219, 114 Cal. Rptr. 2d 482 (2001).  A motion

15  to obtain discovery of an officer's personnel file is known as a

16  Pitchess motion.  See Pitchess v. Superior Court, 11 Cal. 3d 531, 113

17  Cal. Rptr. 897 (1974).  The defendant must first describe the

18  information sought and must show good cause for disclosure.  If the

19  trial court finds good cause, it screens the requested records in

20  camera for relevance to the issue.  California Highway Patrol v.

21  Superior Court, 84 Cal. App. 4th 1010, 1019-20, 101 Cal. Rptr. 2d 379

22  (2000).  A showing of "good cause" requires the defendant "to

23  demonstrate the relevance of the requested information by providing a

24  'specific factual scenario' which establishes a 'plausible factual

25  foundation' for the allegations of officer misconduct committed in

26  connection with defendant."  Id. at 1020 (quoting City of Santa Cruz

27  v. Municipal Court, 49 Cal. 3d 74, 85-86, 260 Cal. Rptr. 520 (1989)).

28       Although a Pitchess motion is a creature of state law, it may

implicate a prisoner's due process right to receive material exculpatory and impeachment evidence.  <u>See</u> <u>Harrison v. Lockyer</u>, 316 F.3d 1063, 1065-66 (9th Cir. 2003)(finding on federal habeas review that California procedure for <u>Pitchess</u> discovery requests, including requirement for preliminary showing of materiality, "faithfully followed" <u>Brady v. Maryland</u>, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), <u>as</u> <u>modified</u> <u>by</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 58 n.15, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)).

The Due Process Clause requires the government to produce to criminal defendants favorable evidence material to their guilt or punishment.  <u>Brady</u>, 373 U.S. at 87.  To establish a <u>Brady</u> violation, a petitioner must show three things: that the evidence was favorable to him, as either exculpatory or impeaching; that the evidence was suppressed by the prosecution either willfully or inadvertently; and that he was prejudiced by the nondisclosure.  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).

Evidence is material for <u>Brady</u> purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).  A defendant may not require disclosure of information in a requested file "without first establishing a basis for his claim that it contains material evidence." <u>Ritchie</u>, 480 U.S. at 58 n.15; <u>Harrison</u>, 316 F.3d at 1066.  This requirement of a threshold showing of materiality also applies in California to <u>Pitchess</u> requests.  <u>Harrison</u>, 316 F.3d at 1066 (noting that <u>Pitchess</u> process operates in parallel to procedure in <u>Brady</u> and

-71-

Ritchie but that state standard is "both a broader and lower threshold for disclosure" than Brady standard)(citing City of Los Angeles v. Superior Court, 29 Cal. 4th 1, 14-15, 124 Cal. Rptr. 2d 202 (2002)).

Here, Petitioner cannot establish a due process violation under the Brady/Ritchie standards. As the trial court observed in denying the Pitchess motion, Petitioner failed to make a preliminary showing of materiality in support of his motion. Petitioner's entire argument about the discovery of the deputies' files was premised solely on the possibility that those records might contain other instances in which the deputies allegedly fabricated information. [See RT at 1204.]

Similarly, Petitioner's claim for habeas relief based on the denial of his motion is not supported by any evidence or knowledge of actual incidents in the deputies' files. Instead, he relies only on speculation and hope that the undisclosed files may have shown complaints filed against the deputies and that those complaints may have had impeachment value. But neither speculation nor hope suffices to show that personnel files contained complaints material to his defense. Because Petitioner's underlying motion made no preliminary showing of materiality, he cannot establish a due process claim for relief based on being denied access to the requested files. See Harrison, 316 F.3d at 1066 (rejecting petitioner's challenge to trial court's denial of Pitchess motion when petitioner failed to make threshold showing that information in files was material to his defense); see also Gutierrez v. Yates, 2008 WL 4217865 at *7 (C.D. Cal. Apr. 8, 2008)(absence of proof that exculpatory evidence would be found in police personnel records "is fatal to petitioner's due process claim"); Gomez v. Alameida, 2007 WL 949425 at *15 (N.D. Cal. Mar. 27, 2007)(same); Page v. Runnels, 2006 WL 2925690 at *8 (N.D.

1   Cal. Oct. 12, 2006)(same).

2        Petitioner is not entitled to habeas relief on this claim.

3        **P.   CLAIM TWENTY-FIVE – APPOINTMENT OF FINGERPRINT EXPERT**

4        In Claim Twenty-six, Petitioner contends that the trial court

5   denied him due process by refusing his request to have a fingerprint

6   expert appointed to assist him in presenting a defense.  According to

7   Petitioner, a fingerprint expert could have testified that some

8   fingerprints – either Petitioner's or the deputies' – should have been

9   found on the gun.  Petitioner maintains that, had this testimony been

10  introduced, he could have supported his theory that the gun was

11  planted on him by the arresting deputies.  [See Traverse at 109-10.]

12  Petitioner raised this claim in a habeas petition which the California

13  Supreme Court denied without comment.  [Lodged Docs. E2, E6.]

14       The Supreme Court has recognized that indigent defendants have a

15  due process right to obtain the assistance of certain expert

16  witnesses.  See Ake v. Oklahoma, 470 U.S. 68, 83, 105 S. Ct. 1087, 84

17  L. Ed. 2d 53 (1985)(defendant had constitutional right to appointment

18  of psychiatrist because defendant's sanity was "significant factor at

19  trial"); accord Williams v. Stewart, 441 F.3d 1030, 1048 (9th Cir.

20  2006); Chaney v. Stewart, 156 F.3d 921, 925 (9th Cir. 1998).  The

21  Supreme Court, however, has declined to consider whether its holding

22  in Ake extends beyond psychiatrists to other expert witnesses and

23  investigators.  See Caldwell v. Mississippi, 472 U.S. 320, 323 n.1,

24  105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)("We . . . have no need to

25  determine as a matter of federal constitutional law what if any

26  showing would have entitled a defendant to [a criminal investigator, a

27  fingerprint expert, or a ballistics expert].").  The Ninth Circuit has

28  similarly limited Ake's holding to psychiatrists and held that it does

-73-

not extend to eyewitness identification experts.  See Jackson v. Ylst,
921 F.2d 882, 886 (9th Cir. 1990)("No issue was presented to the
Supreme Court in Ake concerning the right of an indigent to the
appointment of an expert on eyewitness identification.").

Accordingly, Petitioner's claim fails because the Supreme Court
has not clearly established a constitutional right to the appointment
of forensic experts.  See Carey, 549 U.S. at 77 ("Given the lack of
holdings from [the Supreme] Court regarding [the Petitioner's claim],
it cannot be said that the state court unreasonably applied clearly
established Federal law.")(internal quotation marks and brackets
omitted); see also Sanchez v. Hedgpeth, 706 F. Supp. 2d 963, 988-89
(C.D. Cal. 2010)(rejecting challenge to trial court's refusal to
appoint fingerprint expert "because the Supreme Court has not clearly
established a constitutional right to the appointment of forensic
experts"); Mennick v. Hardison, 2009 WL 187889, *7 (D. Idaho Jan. 26,
2009)("[T]he United States Supreme Court has not extended Ake beyond
appointment of a psychiatrist to answer the question of defendant
competency[ ] . . . [and] to broaden that application to requiring
trial courts to appoint experts to help defendants support other
defenses is beyond the scope of Ake . . . ."); Atcherley v. Scribner,
2008 WL 4279552, at *9-11 (N.D. Cal. Sept. 16, 2008)(Supreme Court has
not clearly established constitutional right to appointment of medical
expert, DNA expert, or fingerprint expert); Huynh v. Runnels, 2006 WL
1646140, *7 (N.D. Cal. June 14, 2006)("As Respondent points out, there
is no clearly-established United States Supreme Court authority
determining the right of indigent defendants to investigative and
other ancillary services. In fact, the Supreme Court expressly has
declined to decide that question.").

-74-

1    Even if Petitioner had a right to a forensic expert, the trial

2    court's failure to appoint one for him did not have a substantial and

3    injurious impact on the jury's verdict.  <u>Brecht</u>, 507 U.S. at 637-38.

4    The primary issue in this case was not whether Petitioner's

5    fingerprints were found on the firearm.  On the contrary, the jury

6    heard testimony from the prosecutor's forensic expert that no usable

7    fingerprints were found on the gun that police recovered from

8    Petitioner.  The primary issue in the case was which version of the

9    arrest the jury found more credible – Petitioner's or that of the

10   arresting deputies.  Petitioner acknowledged this in closing

11   argument.[30]  [RT at 3112-13.]  Although he contends that additional

12   forensic expert testimony would have undermined the prosecutor's

13   expert's assertion that finding fingerprints on guns is uncommon,

14   Petitioner cites no evidence that any expert would have, in fact,

15   testified otherwise.[31]  In any event, the prosecutor's expert testified

16   about numerous reasons why no prints were found on the gun and cited

17   comprehensive studies supporting his opinion that recovering usable

18   fingerprints from a firearm is uncommon.  [RT at 2729-30.]  Given

19   this, there is no reason to believe that the jury would have reached a

20   different verdict had a Petitioner presented expert forensic testimony

21   regarding the lack of fingerprint evidence.

22       Petitioner is not entitled to habeas relief on this claim.

23   _____

24       [30]  Petitioner stated as follows at the beginning of closing
     argument: "[U]ltimately, what the case really points down to is if you
25   believe the officer [sic] when they say they stopped me and asked me
     'Do you have any weapons or contraband on you?' and they said I said,
26   'Yes.' . . .  It boils down to if you believe that."  [RT at 3112-13.]

27       [31]  At trial, Petitioner asserted that he had spoken with an
     expert who would have testified that prints should have been
28   recovered.  [RT at 421.]  However, Petitioner provides no evidence to
     support this assertion.

1

### Q.   CLAIMS TWENTY-EIGHT AND TWENTY-NINE – INSTRUCTIONAL ERROR

2       Petitioner asserts two separate claims of instructional error.

3   In Claim Twenty-eight, he contends that the trial court denied him due

4   process by instructing the jury to resolve a disputed fact in the

5   prosecution's favor.  Specifically, Petitioner faults the trial court

6   for instructing the jury as follows on the legality of the deputies'

7   stop and arrest of Petitioner: "In this case the legality of the

8   conduct of the Sheriff is not before you.  The court has determined

9   that any stop, detention, search or arrest of the defendant was

10  lawful." [RT at 3318; CT at 502.]  According to Petitioner, this

11  instruction effectively required the jury to reject Petitioner's

12  theory of the case – that the deputies fabricated their testimony

13  about observing Petitioner cross the street against a red light and

14  then planted a gun on Petitioner.

15      In Claim Twenty-nine, Petitioner contends that the trial court

16  denied him due process by refusing to instruct the jury with two

17  instructions supporting his theory of defense.  First, Petitioner

18  faults the trial court for failing to instruct the jury that

19  outrageous police misconduct was an affirmative defense to the crimes

20  with which Petitioner was charged.[32]  Second, he faults the court for

21

22      [32]  Petitioner contends that the court should have instructed the
    jury on outrageous police misconduct as follows:

23          It is a defense to a criminal charge that the
        commission of the alleged criminal act was induced or

24      fabricated as a result of police misconduct.  In determining
        whether this defense has been established, you should be

25      guided by the following factors:
        (1)  Whether the police manufactured a crime that otherwise

26           would not likely have occurred;
        (2)  Whether the police themselves engaged in criminal

27           conduct or improper conduct repugnant to the sense of
             justice;

28                                                        (continued...)

failing to instruct the jury that it had to acquit Petitioner if it concluded that police had intentionally destroyed fingerprint evidence in order to convict him.[33]   Petitioner raised both of these claims in a habeas petition which the California Supreme Court denied without comment.   [Lodged Docs. E2, E6.]

A faulty jury instruction will constitute a violation of due process only when the instruction by itself so infected the entire trial that the resulting conviction violates due process.   <u>Middleton v. McNeil</u>, 541 U.S. 433, 437, 124 S. Ct. 1830, 158 L. Ed. 2d 701 (2004); <u>Estelle</u>, 502 U.S. at 71-72.   The instruction must be more than merely erroneous; Petitioner must show there was a "'reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.'"   <u>McNeil</u>, 541 U.S. at 437 (citations omitted); see also <u>Boyde v. California</u>, 494 U.S. 370, 380,

---

[32]   (...continued)
(3)   Whether the police had an overriding desire for a
conviction of an individual.
[CT at 542.]

[33]   Petitioner asked that the jury be instructed on the destruction of evidence as follows:
You have heard testimony that certain items that would normally be available during this trial are not available for your inspection and consideration.   These are fingerprint evidence.
The question of what happened to these items is entirely a question for you to decide.   If you conclude that any of these items is unavailable due to the failure of law enforcement to recognize the potential significance of this evidence, and the destruction was done without the intent to falsely convict the defendant, you must regard the unavailability of that item as another fact that you are to consider together with all the other evidence you have heard and seen during this trial.
If, however, you conclude that any law enforcement officer either destroyed or failed to preserve any one of these items in a deliberate design to falsely convict the defendant, you have a duty to acquit him of all the crimes charged against him.
[CT at 546.]

110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); <u>Cupp v. Naughten</u>, 414 U.S. 141, 146, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)("Before a federal court may overturn a conviction resulting from a state trial in which [an allegedly faulty] instruction was used, it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." <u>Estelle v. McGuire</u>, 502 U.S. at 72 (citation omitted); <u>Cupp</u>, 414 U.S. at 147. When the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); <u>Clark v. Brown</u>, 450 F.3d at 904.

### 1.  <u>Legality of the Deputies' Conduct (Claim Twenty-eight)</u>

No one disputes that the instruction on the legality of the deputies' conduct was intended to keep the jury from wading into whether the deputies had probable cause to arrest Petitioner. That is clear from the reporter's transcript. [RT at 3094-95.] However, when considered in isolation, the instruction could have caused the jurors to believe they were required to reject Petitioner's defense and, instead, credit the deputies' testimony as true. Indeed, the instruction informed the jury that the court had determined that the deputies' conduct was legal, despite Petitioner's testimony that they stopped him under false pretenses, planted evidence on him, and perjured themselves in court.

Nevertheless, when considered in the context of the other

instructions and the overall weight of the evidence, the challenged
instruction, though inartfully worded, did not deprive Petitioner of
his right to a fair trial.   First, the other instructions given made
clear that the jury was free to accept Petitioner's account of the
arrest and to reject the deputies' competing account.   For example,
the jury was instructed that it was the "sole judge[] of the
believability of the witnesses," which necessarily included Petitioner
and the two testifying deputies, and that the jury was to determine
the proper weight to accord each witness's testimony.   [RT at 3320-21,
3324; CT at 506.]   The jury was also instructed that it could reject a
witness's testimony in its entirety if the jury concluded that the
witness wilfully lied.   [RT at 3322-23; CT at 510.]   Thus, had the
jury believed that the deputies had fabricated their testimony, the
jury could have and would have rejected their testimony.   This
conclusion is bolstered by the trial court's instruction to disregard
any statement or action by the court suggesting that the jury find a
fact as true or deem a witness's testimony credible or not credible.
[See RT at 3334; CT at 528.]

        Furthermore, the trial court's instructions left no doubt that
the prosecutor was required to prove each element of the charged
offense beyond a reasonable doubt.   [RT at 3324, CT at 514
(prohibiting jury from convicting Petitioner absent proof of each
element of charged offenses); RT at 3326, CT at 516 (stating that
Petitioner was presumed innocent and the prosecutor bore burden of
proving guilt beyond reasonable doubt); RT at 3326-28, CT at 518-19
(identifying required elements for each offense).]   Additionally, the
court admonished the jurors that they were not to single out any
particular instruction, but rather to consider any instruction in

-79-

1   light of the other instructions.  [RT at 3316; CT at 498.]  Given

2   these instructions, there is little reason to believe that the jury

3   would have interpreted the challenged instruction to mean that the

4   jury could not accept Petitioner's account of the arrest, if the jury

5   had found Petitioner's account to be credible.

6        Second, the court's admonitions to the jury during Petitioner's

7   closing argument made clear that the challenged instruction dealt only

8   with whether the sheriff's department had violated Petitioner's Fourth

9   Amendment right to be free from unreasonable searches and seizures.

10  Indeed, the trial court did not mention the legality or propriety of

11  the deputies' conduct when, during closing arguments, Petitioner

12  argued that they falsely accused him of carrying a gun.  Instead, the

13  court addressed the issue of the propriety of the search and seizure

14  only when Petitioner attempted to argue that the deputies had violated

15  his Fourth Amendment rights.  [RT at 3132-33.]  At that point, the

16  court explained in unambiguous terms that "there is no search and

17  seizure question here for the jury."  [RT at 3133.]  The court further

18  explained that the jury was "not to question the propriety of the stop

19  or the search or the patting down of the defendant"; instead, the jury

20  only had to "decide whether [Petitioner], in fact, had [a] weapon in

21  his possession."  [RT at 3133.]

22       Considering the context of this admonition and the fact that it

23  strongly resembled the challenged instruction, there is no reason to

24  believe that the jury misapplied the challenged instruction.  Instead,

25  the record suggests that the jury understood the challenged

26  instruction to mean that the jury was not to consider whether the

27  deputies had violated the Fourth Amendment, but rather whether they

28  had testified truthfully or not.

Third, the jury's actions further illustrate that it did not interpret the challenged instruction to mean that it had to reject Petitioner's testimony and his theory of defense.  During deliberations, the jury asked the court to read back the portion of Petitioner's testimony in which he denied having the gun.  [RT at 3340-43.]  Thus, the record shows that the jury considered Petitioner's testimony, but ultimately found it less credible than that of the deputies.

Fourth, nothing suggests that the prosecutor exploited any potential for confusion that the challenged instruction may have caused.  For example, rather than suggest that the jury was bound to accept the deputies' account of the arrest, the prosecutor instead argued that Petitioner had presented no evidence showing why they would falsely accuse Petitioner of carrying a gun.  [See, e.g., RT at 3301-07; 3308.]  Indeed, the prosecutor mentioned the challenged instruction only once during her relatively brief closing argument. [RT at 3312.]  When she did mention the instruction, she merely paraphrased its wording without elaborating on it.  [Id.]

Finally, the instruction could not have had a substantial and injurious impact on the jury's verdict.  Brecht, 507 U.S. at 637-38. As Petitioner acknowledged, the case boiled down to whether or not the jury found the deputies credible.  [RT at 3112-13.]  Despite lengthy cross-examination of both witnesses, Petitioner presented no compelling reason to question the deputies' credibility.  Nor was he able to establish a motive for the deputies to fabricate the events surrounding the arrest.  There is no reason to believe that the jury would have reached a different verdict had the trial court excluded the challenged instruction.

1    Petitioner is not entitled to habeas relief on this claim.

2    **2.   Misconduct and Destruction of Evidence (Claim Twenty-nine)**

3    Due process requires that criminal prosecutions 'comport with

4    prevailing notions of fundamental fairness' and that 'criminal

5    defendants be afforded a meaningful opportunity to present a complete

6    defense.'"   Clark, 450 F.3d at 904 (citation omitted).   "Failure to

7    instruct on the defense theory of the case is reversible error if the

8    theory is legally sound and evidence in the case makes it applicable."

9    Beardslee v. Woodford, 358 F.3d 560, 577 (9th Cir. 2004)(citation

10   omitted).   Even when these preconditions are met, habeas relief is not

11   available unless "the alleged instructional error 'had substantial and

12   injurious effect or influence in determining the jury's verdict.'"

13   Clark, 450 F.3d at 905 (citation omitted).   A "substantial and

14   injurious effect" means a "reasonable probability" that the jury would

15   have arrived at a different verdict had the instruction been given.

16   Clark, 450 F.3d at 916.   In making this determination, the reviewing

17   court considers two overriding factors: (1) the weight of evidence

18   that contradicts the defense; and (2) the extent to which the defense

19   could have completely absolved the defendant of the charge.   Byrd v.

20   Lewis, 566 F.3d 855, 860 (9th Cir. 2009), cert. denied, __ U.S. __,

21   130 S. Ct. 2103, 176 L. Ed. 2d 733 (2010).

22   Here, the trial court's refusal to instruct the jury as requested

23   by Petitioner did not violate his right to a fair trial.   First,

24   assuming without deciding that the trial court erred in refusing to

25   instruct the jury on outrageous police misconduct, that error could

26   not have had a substantial and injurious impact on the jury's verdict.

27   The case came down to a credibility contest: two deputies testified

28   that they recovered a loaded gun from Petitioner and that he admitted

to having a gun, while Petitioner testified that the deputies planted the gun on him and that he never admitted to carrying a gun.  These competing testimonies had to be resolved by the jury before it could reach its verdict.  Assuming the jury had found Petitioner's testimony credible, it would have necessarily concluded that the prosecutor failed to prove that Petitioner possessed a firearm.  The jury did not need the proposed instruction to acquit Petitioner based on a finding of outrageous police misconduct.  Thus, Petitioner cannot show that lack of the proposed instruction denied him his right to a fair trial.

Furthermore, the other instructions given sufficiently alerted the jury that it could not convict Petitioner if it believed that the deputies planted the gun on him and falsified their testimony.  For example, the jury was instructed that it could not convict Petitioner of possession with a firearm unless each element of the crime was established beyond a reasonable doubt.  [RT at 3324, 3326-28; CT at 514, 518-19.]  The jury was also instructed that Petitioner was presumed innocent and that the prosecution bore the burden of proving guilt beyond a reasonable doubt.  [RT at 3326; CT at 516.]  If, therefore, the jury accepted Petitioner's theory, it would have concluded that the prosecutor failed to meet its burden of proving guilt.  Moreover, the jury was instructed that it was the sole judge of the believability of witnesses, and on the factors to consider in judging witnesses' believability.  [RT at 3320-21; CT at 506.]  The jury was also instructed that it could reject the testimony of any witness if it believed the witness had willfully offered false testimony.  [RT at 3322-23; CT at 510.]  Taken as a whole, the instructions properly informed the jury that it could and should acquit Petitioner if it concluded that police planted evidence on him

-83-

1  and falsified their testimonies.  The proposed outrageous police
2  misconduct instruction was, therefore, unnecessary.

3      Second, Petitioner's proposed destruction of evidence instruction
4  was not supported by any evidence.  As explained in the discussion of
5  Claim Seven, nothing supports Petitioner's premise that any evidence
6  was actually destroyed.  [RT at F25-27.]  The trial court conducted a
7  full hearing on this matter.  [RT at F3-29.]  Based on uncontroverted
8  testimony at hearing, the court concluded that no evidence had been
9  destroyed.  That finding is presumed to be correct.  See Cooper, 255
10  F.3d at 1114 (trial court's finding that officers acted in good faith
11  and did not destroy evidence binding because no exception was
12  applicable).

13      Moreover, even if there was evidence that fingerprint evidence
14  had been destroyed, Petitioner was not denied a fair trial because the
15  trial court failed to provide the requested instruction on destruction
16  of evidence.  Nothing in the record suggested that any evidence had
17  been destroyed willfully.  Therefore, the last paragraph of the
18  proposed instruction was inapplicable.  If the jury believed that
19  fingerprint evidence had been inadvertently destroyed, it was already
20  free to consider that fact in rendering its verdict.  [See RT at 3318,
21  CT at 501 (instructing jury that it could consider all relevant facts
22  and evidence presented at trial); see also RT at 3320, CT at 504
23  (instructing jury that "both direct and circumstantial evidence are
24  acceptable as a means of proof").]  To the extent that any part of the
25  proposed instruction was applicable, it was nevertheless unnecessary
26  in light of the other instructions.

27      Finally, Petitioner cannot show that the lack of the proposed
28  instruction on destruction of evidence had a substantial and injurious

1   impact of the jury's verdict.  <u>Brecht</u>, 507 U.S. at 637-38.  Even if

2   the fingerprint evidence had existed and was inadvertently destroyed,

3   this would not undercut the overwhelming evidence against Petitioner.

4   As discussed above, two deputies testified that they recovered a

5   loaded firearm from Petitioner and that Petitioner admitted that he

6   was carrying a firearm.  To the extent that the jury might have

7   considered the purported inadvertent destruction of evidence, that

8   consideration would not have caused the jury to disregard the

9   deputies' testimony.

10      Petitioner is not entitled to habeas relief on this claim.

11      **R.   CLAIM THIRTY – REQUEST FOR TRANSCRIPT**

12      In Claim Thirty, Petitioner contends that the trial court denied

13   him due process by denying his requests for trial transcripts.

14   Petitioner asserts that he needed the transcripts in order to file a

15   motion for new trial in the trial court.  Although Petitioner appears

16   to acknowledge that, under state law, parties are generally not

17   entitled to court-provided trial transcripts in order to file a new

18   trial motion [Traverse at 121], he argues that his case was

19   sufficiently extraordinary to deviate from this general rule.  In

20   support, Petitioner notes that, unlike most cases in which new trial

21   motions are filed, the evidence was no longer fresh in his mind

22   because over three months had elapsed between the trial and the filing

23   of the new trial motion.  [<u>Id.</u>]  Petitioner also asserts that denying

24   him the trial transcripts was improper because, unlike most criminal

25   defendants, he chose to represent himself and, therefore, needed the

26   transcripts to file a proper new trial motion.  Petitioner raised this

27   claim in a habeas petition which the California Supreme Court denied

28   without comment.  [Lodged Docs. E2, E6.]

The United States Supreme Court has held that "the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." Britt v. North Carolina, 404 U.S. 226, 227, 92 S. Ct. 431, 30 L. Ed. 2d 400 (1971); see also Griffin v. Illinois, 351 U.S. 12, 18-19, 76 S. Ct. 585, 100 L. Ed. 891 (1956). In Britt, the Supreme Court stated that a transcript of a prior mistrial is presumptively valuable to a criminal defendant facing retrial. 404 U.S. at 228. In Griffin, the Supreme Court held that, when states provide appellate review of criminal convictions, indigent defendants must be provided with trial transcripts to assist them in seeking appellate review. 351 U.S. at 13 n.3; see also Williams v. Oklahoma City, 395 U.S. 458, 458-59, 89 S. Ct. 1818, 23 L. Ed. 2d 440 (1969)(per curiam)(constitutional error when state provided no trial transcript to indigent defendant on appeal); Gardner v. California, 393 U.S. 367, 370-71, 89 S. Ct. 580, 21 L. Ed. 2d 601 (1969)(indigent defendant had to be provided with evidentiary hearing transcript from original trial so he could file new habeas petition); Long v. Dist. Court of Iowa, 385 U.S. 192, 192-94, 87 S. Ct. 362, 17 L. Ed. 2d 290 (1966)(per curiam)(failure to provide defendant with any portion of habeas transcript was error).

Here, however, Petitioner did not seek the trial transcripts in the face of a mistrial, nor was he denied the transcripts on appeal. Instead, he sought the transcripts only to file a new trial motion. However, the Supreme Court has never held that states are required to provide indigent defendants with trial transcripts for purposes of filing such a post-trial motion. On the contrary, in Britt, the Supreme Court conceded that the "outer limits" are "not clear" on the reach of the principle that states must provide indigent defendants

-86-

with "the basic tools of an adequate defense or appeal."  404 U.S. at 227.  Given this lack of clarity, the California Supreme Court could not have unreasonably applied any clearly established Federal law in rejecting Petitioner's challenge to the trial court's decision denying him trial transcripts to aid him in filing his new trial motion.  See Carey, 549 U.S. at 77; Wright v. Van Patten, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008)("Because our cases give no clear answer to the question presented . . . 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.' Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized.")

Moreover, even if Petitioner had a constitutional right to trial transcripts to file his new trial motion, he could not show that the trial court's failure to provide him with those transcripts had a substantial and injurious impact on that court's consideration of his new trial motion.[34]  Brecht, 507 U.S. at 637-38.  Despite not having the requested trial transcripts, Petitioner was able to file a comprehensive, eighty-page new trial motion.  [CT at 569-649.] Indeed, the trial court commented that the motion was "very complete,

---

[34]  In Kennedy v. Lockyer, 379 F.3d 1041, 1053 (9th Cir. 2004), the Ninth Circuit held that a state's complete failure to provide an indigent defendant with a transcript of a mistrial for use in connection with a second trial constitutes structural error.  Kennedy, however, is readily distinguishable from Petitioner's case because, in Kennedy, the Ninth Circuit addressed a challenge to the state's failure to provide trial transcripts to an indigent defendant facing retrial after a mistrial was declared in the defendant's first trial. 379 F.3d at 1042-43.  Here, by contrast, Petitioner did not face retrial, but rather sought to file a motion for a new trial afer the jury had reached a verdict.  Accordingly, in determining whether Petitioner is entitled to relief based on lack of access to his trial transcripts, the court should apply the standard for assessing trial errors as set forth in Brecht.  See Lee v. Marshall, 42 F.3d 1296, 1298 (9th Cir. 1994)(per curiam).

very thorough." [RT at 4802, 4806 (court "carefully considered" Petitioner's new trial motion and described it as "voluminous").] Although Petitioner insists that he could have corroborated his claims had he been provided the trial transcript, he cites no portion of the trial transcript that would have corroborated any of his claims. See James, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Petitioner likewise fails to explain how the trial court, which was familiar with the case and testimony, would have reached a different conclusion on the new trial motion even if Petitioner had supplemented his motion with cites to the trial transcript.

Petitioner is not entitled to habeas relief on this claim.

### S.   CLAIMS THIRTY-TWO AND THIRTY-THREE – CUMULATIVE ERROR

Petitioner asserts two separate cumulative error claims. First, in Claim Thirty-two, Petitioner asserts that the cumulative effect of the prosecutor's many acts of misconduct alleged in Claims Eight (discriminating against minority jurors), Eleven (signaling a prosecution witness), Fourteen (vouching for testifying deputies), and Fifteen (inflaming the jury's passions and prejudices) denied him a fair trial.[35]

Second, in Claim Thirty-three, he asserts that a "combined pattern of judicial and prosecutorial misconduct" denied him a fair trial. In support, he cites the same instances of prosecutorial misconduct cited in Claim Thirty-two, but in Claim Thirty-three

---

[35]  The purported discrimination against minority jurors alleged in Claim Eight is not here considered in analyzing the merits of this cumulative error claim, because a Batson violation is structural error that requires automatic reversal. See Williams v. Woodford, 396 F.3d 1059, 1070 (9th Cir. 2005).

Petitioner explains that the trial court compounded the impact of the prosecutorial misconduct by committing the errors and misconduct alleged in Claims Two (restricting Petitioner's ability to cross-examination); Nineteen (showing hostility to Petitioner and favoritism to prosecutor); Twenty (improperly communicating with jury); and Twenty-nine (refusing to instruct on defense theory).  Petitioner raised both of these claims in a habeas petition which the California Supreme Court denied without comment.  [Lodged Doc. E2, E6.]

The Supreme Court has found that the combined effect of multiple trial court errors violates due process if it makes the resulting criminal trial fundamentally unfair.  <u>Chambers</u>, 410 U.S. at 298 (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"); <u>see also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 53, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996)(<u>Chambers</u> held that "erroneous evidentiary rulings can, in combination, rise to the level of a due process violation"); <u>Taylor v. Kentucky</u>, 436 U.S. 478, 487 n.15, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978).

According to the Ninth Circuit, these Supreme Court cases show that the "cumulative effect doctrine" is "clearly established."  <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007).  Thus, in the Ninth Circuit, "the cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."  <u>Id.</u> (<u>citing</u> <u>Chambers</u>, 410 U.S. at 290 n.3).

Cumulative error, however, does not warrant habeas relief unless the errors have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  <u>Parle</u>, 505 F.3d at

-89-

1   927 (quoting Donnelly v. DeChristoforo, 416 U.S. at 643).  This
2   standard can be met only if the "combined effect of the errors had a
3   'substantial and injurious effect or influence on the jury's
4   verdict.'"  Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 637).
5   "In simpler terms, where the combined effect of individually harmless
6   errors renders a criminal defense "far less persuasive than it might
7   [otherwise] have been," the resulting conviction violates due process.
8   Parle, 505 F.3d at 927 (quoting Chambers, 410 U.S. at 294, 302-03).

9       Here, neither of Petitioner's cumulative error claims warrants
10  habeas relief.  First, assuming the prosecutor committed misconduct,
11  Petitioner cannot show that the cumulative effect of the prosecutor's
12  actions had a substantial and injurious impact on the trial.  As
13  explained above, the prosecutor's purported act of signaling a
14  prosecution witness could not have impacted the jury's verdict
15  because, when the supposed signaling occurred, the witness was being
16  questioned on an inconsequential matter.  Similarly, the prosecutor
17  did not inflame the passions and prejudices by momentarily alluding to
18  an incident involving the murder of an officer because that isolated
19  allusion merely illustrated the common sense proposition that police
20  officers face dangers on the job.  Even if the prosecutor vouched for
21  the credibility of the testifying deputies, that error could not have
22  impacted the jury's verdict because no credible evidence was
23  introduced to call the deputies' credibility into question.

24      While the combined impact of these purported instances of
25  misconduct could conceivably have had a slight impact on the
26  proceedings, it could not have had a substantial and injurious impact
27  in light of the evidence against Petitioner.  As discussed above, two
28  deputies testified that they recovered a loaded firearm from

-90-

1  Petitioner, and that Petitioner admitted he was carrying a firearm.

2  Although Petitioner urged the jury to find that the deputies had

3  fabricated these facts, he offered the jury no reason to do so.

4  Accordingly, the prosecutor's purported acts of misconduct, whether

5  singly or in combination, did not deny Petitioner a fair trial.

6      Second, Petitioner has not shown that the trial court engaged in

7  a pattern of misconduct.  As explained above, the trial court acted

8  within its discretion to end Petitioner's cross-examination of the

9  testifying deputies.  Petitioner failed to establish that the trial

10  court was biased against him or, more importantly, that any alleged

11  bias stemmed from an extrajudicial source.  Likewise, no evidence

12  supports Petitioner's assertion that the trial court improperly

13  communicated with the jury.  Finally, the trial court properly

14  rejected Petitioner's proposed instructions on outrageous police

15  misconduct and destruction of evidence because they were either

16  unnecessary or unsupported by the evidence at trial.

17     Petitioner is not entitled to habeas relief on either of his

18  cumulative error claims.

19     **T.   CLAIM THIRTY-FOUR – APPELLATE COUNSEL'S PERFORMANCE**

20     In his final claim for relief, Petitioner contends he was denied

21  his constitutional right to effective assistance of appellate counsel.

22  The Due Process Clause guarantees a criminal defendant effective

23  assistance of counsel on his first appeal as of right.  Evitts v.

24  Lucey, 469 U.S. 387, 391–405, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985).

25  The standards for assessing the performance of trial and appellate

26  counsel are the same.  Id. at 395–99; Cockett v. Ray, 333 F.3d 938,

27  944 (9th Cir. 2003).  Under both, Petitioner bears the burden of

28  establishing both components of the standard set forth in Strickland

1  v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674

2  (1984).  First, Petitioner must show that his attorney's

3  representation fell below an objective standard of reasonableness.

4  Id. at 687-88, 690.  Second, Petitioner must show that he was

5  prejudiced by demonstrating a reasonable probability that, but for his

6  counsel's errors, the result would have been different.  Id. at 687,

7  694; Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989); Cockett,

8  333 F.3d at 944.  "Strickland establishes a strong presumption against

9  judging an attorney's chosen tactics as ineffective because it 'could

10 dampen the ardor and impair the independence of defense counsel,

11 discourage the acceptance of assigned cases, and undermine the trust

12 between attorney and client.'"  Pollard v. White, 119 F.3d 1430, 1435

13 (9th Cir. 1997)(citing Strickland, 466 U.S. at 690).  Appellate

14 counsel has no constitutional duty to raise every issue, when, in the

15 attorney's judgment, the issue has little or no likelihood of success.

16 McCoy v. Wisconsin, 486 U.S. 429, 436, 108 S. Ct. 1895, 100 L. Ed. 2d

17 440 (1988).

18     Here, Petitioner was not denied effective assistance of appellate

19 counsel.  Petitioner faults appellate counsel for failing to raise on

20 appeal the arguments that Petitioner asserts in Claims One through

21 Three, Five through Seven, and Ten through Thirty-three.[36]  [Traverse

22 at 130-31.]  However, as discussed above, there is no merit to the

23 arguments asserted in any of those claims.[37]  Accordingly, Petitioner's

24 challenge to appellate counsel's performance fails because Petitioner

25

26    [36]  Appellate counsel asserted claims corresponding to present
   Claims Four, Eight, and Nine.  [See Lodged Doc. A2.]

27    [37]  Claims Ten, Thirteen, Sixteen, Seventeen, Twenty-four,
   Twenty-seven, and Thirty-one are not addressed here because Petitioner
28 concedes that they lack merit.  [Traverse at 57.]

1   cannot show that appellate counsel performed unreasonably in failing

2   to assert claims that were doomed to fail.  See Kimmelman v. Morrison,

3   477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); Boag v.

4   Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)(counsel's failure to raise

5   meritless argument does not constitute ineffective assistance).

6        Petitioner does not merit habeas relief on this claim either.

7                        **VI.   RECOMMENDATION**

8        For the reasons discussed above, it is recommended that the court

9   issue an order: (1) approving and accepting this Report and

10  Recommendation; and (2) denying the petition and dismissing this

11  action with prejudice.

12

13  DATED:  April 7, 2011

14

15                              _____
                                  Carla M. Woehrle
16                                CARLA M. WOEHRLE
                                United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

                                  -93-